**TENNESSEE ELECTRIC POWER CO. et al.**
**v. TENNESSEE VALLEY AUTHORITY**
**et al.**
**No. 228.**

District Court, E. D. Tennessee, N. D.
Jan. 24, 1938.

Charles Trabue and Trabue, Hume & Armistead, all of Nashville, Tenn., Charles M. Seymour and Frantz, McConnell & Seymour, all of Knoxville, Tenn., and Raymond T. Jackson, W. H. Bemis, S. D. L. Jackson, Jr., and Baker, Hostetler, Sidlo & Patterson, all of Cleveland, Ohio, for complainants.

James Lawrence Fly, Gen. Counsel, Tennessee Valley Authority, of Knoxville, Tenn., John Lord O'Brian, of Buffalo, N. Y., and William C. Fitts, of Knoxville, Tenn., for defendants.

Before ALLEN, Circuit Judge, and GORE and MARTIN, District Judges.[1]

---

1 This case was tried before FLORENCE E. ALLEN, Circuit Judge, JOHN J. GORE, District Judge, and JOHN D. MARTIN, District Judge, each of whom

ALLEN, Circuit Judge.

Complainants have filed a bill in equity praying for relief against the operation of the Tennessee Valley Authority Act of 1933, as amended 48 Stat. 58, 49 Stat. 1075, 16 U.S.C. § 831 et seq, 16 U.S.C.A. § 831 et seq. The bill joins as defendants the Tennessee Valley Authority, the agency created by the Congress to carry out the provisions of these statutes, and Arthur E. Morgan, David E. Lilienthal, and Harcourt A. Morgan, who are the chief executive officers of the Authority and constitute its board of directors.

■ The complainants are nineteen companies generating, transmitting and distributing power within Tennessee, Alabama, Mississippi, North Carolina, South Carolina, Kentucky, Virginia, West Virginia, and Georgia, one of which, the Georgia Power Company, has been enjoined from participating in this action by the United States District Court for the Northern District of Georgia. Georgia Power Co. v. Tennessee Valley Authority, 17 F.Supp. 769. This decree has been affirmed by the Court of Appeals for the Fifth Circuit. 89 F.2d 218. For this reason we give no consideration to alleged competition of the Authority with the Georgia Power Company.

The complainants are in general owned by holding companies, as set forth in the findings of fact. They are all taxpayers, citizens of and authorized to do business within the states in which they operate, and none of them claims to operate under any exclusive franchise.

The bill cannot be summarized within the appropriate limits for a trial court's opinion. In addition to its seventy pages of pleading and sixty-five pages of exhibits, it contains within the bill itself much that is argumentative, repetitious and immaterial to the legal questions presented. It charges coercion, fraud and conspiracy on the part of the defendants officially and individually. It charges that Secretary Harold L. Ickes, Public Works Administrator, has joined with the Authority in certain coercion and conspiracy against the legal rights of these complainants. The argumentative matter and conclusions which we deem immaterial are so interwoven with allegations bearing upon the legal questions presented that it is impossible to extricate them. The same statement is true of the prayer. Paragraphs h, i, l, o, p and q of the prayer are considered by the court to have no relation to this case under Ashwander v. Tennessee Valley Authority, 297 U.S. 288, at page 324, 56 S.Ct. 466, 472, 80 L.Ed. 688, which held that such matter presents no justiciable controversy. It suffices, therefore, to say that in its essential and material features the bill seeks a decree holding that the Tennessee Valley Authority Act of 1933, as amended, and the acts done by the board of directors thereunder officially and individually, violate the Constitution of the United States. It seeks an injunction restraining the defendants, their agents and employees, from carrying out the provisions of the statute with reference to the sale of electric power, from purchasing, constructing or otherwise acquiring electric generating plants, transmission lines or distribution lines, or from selling electric energy, except such energy as may be produced at Wilson Dam, "to the extent the production and sale of power at Wilson Dam has been held legal." For practical purposes this bill seeks to enjoin the further construction of TVA dams now in process of construction in the Tennessee Valley, the construction of new dams in such valley for which specific appropriation has been made by Congress, and the operation for generation and sale of electric power of all TVA dams built and to be built.

■ The answer denies the material allegations of the bill. Only one of the affirmative defenses requires special mention. The defendants claim that certain of the complainants are estopped to deny the constitutionality of the TVA statutes because of extensive purchases of power from the Authority. These purchases were made under the contract of January 4, 1934, by which certain complainants contracted with the Authority to transfer to the Authority their plants, lines, equipment, customers and franchises within certain counties within Mississippi and Alabama for a valuable consideration and up-

---

was designated to hear and determine the case by CHARLES H. MOORMAN, Senior Circuit Judge of the United States Circuit Court of Appeals for the Sixth Circuit in accordance with the provisions of the statute, 50 Stat. 751, 752, § 3,

28 U.S.C.A. § 380a, which requires the hearing and determination of certain cases involving the constitutionality of congressional enactments by such a Three-Judge Court.

on the condition that the Authority would not operate within those states outside of the counties specified. The properties have been transferred and the contract to date has been fully performed. The court has ruled in favor of the complainants on this contention, and has held that the record presents no essential difference from the situation covered by the ruling as to estoppel in the Ashwander Case, supra, 297 U.S. 288, at page 323, 56 S.Ct. 466, 472, 80 L.Ed. 688, and therefore this question will not be discussed.

After a trial which consumed about seven weeks, in which approximately 1,100 exhibits were offered, the material issues in the case as briefed, argued and outlined in the actual testimony are defined as follows:

(1) Whether the Authority is engaged in acts constituting in law malice, coercion, and duress, to the injury of complainants.

(2) Whether the Authority and the individual defendants have conspired with Secretary Ickes and the Public Works Administration to induce municipalities and co-operative associations through loan grant agreements from the Public Works Administration to set up their own distribution systems and to coerce them into executing contracts for purchase of TVA power by threat of denial or cancellation of such PWA loan grants.

(3) Whether the acts of the defendants are authorized by the TVA statutes.

(4) Whether the act itself is unconstitutional and void, and the acts done under it are illegal because the Congress is not empowered either under the interstate commerce clause, article 1, § 8, or under the national defense powers, article 1, section 8, of the United States Constitution, to enact the TVA statutes.

(5) Whether the generation of electricity at the TVA dams is unlawful because it is inconsistent with the regulation of interstate commerce, with flood control, with the improvement of navigation on a navigable river, and with purposes of national defense.

(6) Whether the method of disposition of electric energy authorized by the TVA statutes is appropriate and constitutional under the power to dispose of property belonging to the United States conferred upon the Congress by section 3 of article 4 of the Constitution.

Each of the dams constructed, in process of construction, and proposed for the TVA system, while varying somewhat in use, as hereafter set forth, is a unit of an integrated multiple-purpose project, the system being designed for co-ordinated use of the full benefits of the river along the line of navigation, flood control, national defense and power development. Wherever water falls, power is created, and one of the express purposes of the TVA statutes is that hydro-electric power so created shall be sold to assist in liquidating the cost of the project. This is in line with the general development of the conservation movement from 1908 to the present, as it relates to streams. See National Waterways Commission Report, Senate Document 469, 62d Congress, Second Session, Appendix I, pages 27, 52, 61, 82, 85, 87; Statement of Chairman of Federal Power Commission, House Document 395, 73d Congress, Second Session, page 54; Report of National Resources Board, pages 263, 264. Similar provisions as to river projects have been embodied in previous legislation. In 1912 a statute was enacted authorizing the Secretary of War to provide, in navigation dams, in order to make possible the economical future development of water power, such foundations, sluices, and other works as may be considered desirable for the development of such power. Act July 25, 1912, § 12, 37 Stat. 233, 33 U.S.C.A. § 609. The Boulder Canyon Project Act of 1928, 45 Stat. 1057, 43 U.S.C.A. § 617 et seq., provided for a multiple-purpose project for irrigation, flood control, improvement of navigation and generation of power. As fully appears from the opinion in Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154, navigation on the Colorado River was negligible in comparison with navigation on the Tennessee River under the record in this case. Though navigation on the Colorado River had ceased, the project of reclaiming its navigability was held by the Supreme Court to establish the constitutionality of the multiple-purpose project, including the generation and sale of power.

*TVA Project.*

Pursuant to the TVA statute as amended and to subsequent related enactments, the Authority has constructed and is planning to construct seven high dams on the main channel of the Tennessee River, and certain dams on its tributaries. The Tennessee River is formed by the confluence of the Holston and French Broad Rivers in the east-central part of Tennessee. It flows

southwesterly across the eastern part of Tennessee into Alabama, westerly across the northern part of Alabama, northerly between Alabama and Mississippi, and across the western part of Tennessee and Kentucky, and empties into the Ohio River near Paducah, Kentucky. Its length is 652 miles, and its drainage basin is 40,600 square miles. It has eight principal tributaries. The main stream dams, including Wilson, which was constructed previous to 1933, are as follows:

(1) Gilbertsville, on which preliminary investigations are in progress, located in Kentucky about 22 miles from the mouth of the river.

(2) Pickwick Landing Dam, under construction and almost completed, located in Tennessee about 206 miles from the river's mouth.

(3) Wilson Dam, now in operation, constructed by United States Army engineers and transferred to the Authority under the TVA Act, located at Muscle Shoals, Alabama, about 259 miles from the river's mouth.

(4) Wheeler Dam, construction of which was begun by the United States Army engineers and completed by the Authority, located in Alabama about 15 miles above Wilson Dam and about 275 miles from the river's mouth. This dam is now in operation.

(5) Guntersville Dam, under construction, located near Guntersville, Alabama, 349 miles from the mouth of the river.

(6) Chickamauga Dam, now under construction, located near Chattanooga, Tennessee, 471 miles from the mouth of the river.

(7) Watts Bar Dam, on which preliminary investigations are in progress, located in Tennessee about 530 miles from the mouth of the river.

(8) Coulter Shoals Dam, on which preliminary investigations are in progress, located in Tennessee 602 miles from the river's mouth.

The tributary dams are Norris, completed and in operation, located in Tennessee on the Clinch River about 79 miles from the mouth of the Clinch and about 647 miles from the mouth of the Tennessee, and Hiwassee Dam, now under construction, located in North Carolina on the Hiwassee River about 75 miles from the mouth of that river and about 560 miles from the mouth of the Tennessee River.

A third tributary reservoir, Fontana, on the Little Tennessee River, is recommended by the Authority, but the Congress has made no specific appropriation for this suggested dam. While Wheeler and Norris are the only dams built by the Authority which are completed and in operation, they co-ordinate in use with Wilson at Florence, Alabama. They release water to Wilson, and thus aid in the generation of power at Wilson. Wilson Dam was built under the national defense powers of the Congress, as held in Ashwander v. Tennessee Valley Authority, supra. While the constitutional authority to dispose of electric energy generated at Wilson Dam is not and cannot be questioned, its present use in combination with Norris and Wheeler, and its future use in conjunction with Guntersville, Chickamauga and Hiwassee, all of these dams being upstream from Wilson and each being part of an integrated system built for the combined purposes of navigation, flood control, power and national defense, has immediate bearing on this case.

The importance of the Tennessee drainage basin has been recognized for over a century and repeated acts of Congress have provided for the canalization of different parts of the river. A canal with locks throughout the length of Muscle Shoals opened to navigation in 1834 fell into disuse. Another Muscle Shoals canal was completed about 1891. The Rivers and Harbors Act of 1890, 26 Stat. 426, provided that the Colbert Shoals section should be improved by a lock and a canal. In 1913 the Hale's Bar lock and dam, completed by private interests, provided a canalization of 33 miles of the river below Chattanooga. The Widow's Bar lock and dam below Hale's Bar was completed in 1926. Wilson Dam provided a canalized waterway for 15½ miles from Muscle Shoals. Lock No. 1, immediately below Wilson Dam, was completed in 1926.

These projects were in general unrelated and unco-ordinated. This was the situation when a comprehensive survey of the Tennessee basin was ordered in five successive Acts of Congress from 1922 to 1928, resulting in the reports contained in House Document 328. This document contained an exhaustive report by the district engineer and comments thereon, together with recommendations made by the division engineer, the board of engineers for rivers and harbors, and the chief of engineers. It set forth alternate plans for securing a depth of nine feet in the main stream, that is, an improvement for navigation only, and also a plan for the development of the river and its tributaries for purposes of flood control,

navigation and power. The suggested plan for the improvement of navigation only involved in one of its phases the building of 32 low dams which would provide·a nine-foot navigable channel, but would have no value either for flood control or power.

*House Document 328.*

The complainants vigorously assert that House Document 328 recommends the low dam plan, as distinguished from the TVA plan. It is of little assistance in this phase of the controversy to rely only upon the recommendations of the various engineers, without studying the text (House Document 328, pages 1-25). As to the report of the district engineer, of which the chief of engineers said "There has never been presented to Congress a more thorough and exhaustive study", the board of engineers for rivers and harbors, in its conclusions on the various projects presented, stated that "The construction of the storage reservoirs" (on the tributaries) "described in this report would have a favorable effect in reducing floods on the Tennessee River and on the lower portions of its tributaries" (p. 23). It declared that "The improvement of the Tennessee from its mouth to Knoxville by a series of low movable dams without power development would have practically no effect on floods" (p. 23). It also said, speaking of low-lift dams, that "Such a waterway would be inferior to the high-dam developments and would not permit the economical development of power" (p. 13). The board of engineers pointed out that in addition to having no value whatever for flood control, the 32 low dams, though less expensive to construct than the high dams, provided a navigation channel inferior to that of the high dam plan.

It stated its opinion that the·river "has large potential value as a means of transportation and that its improvement to a depth of nine feet would ultimately make it an important feeder to the Ohio-Mississippi system" (p. 20). It concluded that "It is evident that the full utilization of the resources of this river for the public benefit requires its improvement by means of high dams built for the joint development of power and navigation."

These extracts show that consideration of the bare recommendations, apart from the conclusions expressed, are misleading. In the recommendations the division engineer disagreed with the district engineer who drew the report, as to his estimate of the amount of benefit to navigation. The board of engineers disagreed on certain points with the division engineer, and the chief of engineers, in certain matters, disagreed with all of his subordinates. But the projects actually recommended by each of these engineers were not in essential features the same as those embodied in the TVA statutes. They provided for the development of the river by private interests, or by a combination of private interests and the Government.

In order to carry out this policy, the· Rivers and Harbors Act was passed in 1930, 46 Stat. 918, 927, 928, extending to private interests on certain conditions the right to develop the river by a series of high dams in co-operation with the Government. No private interest availed itself of the opportunity and in 1933 Congress delegated the task to an agency of the Government.

The program adopted by the Authority, in its main features, and the choice of the sites for the various dams follow the broader multiple-project plan outlined in House Document 328 (p. 43), commended by the board of engineers of rivers and harbors, as superior to the low dam plan. This multiple-project contemplated the erection of seven high dams in the main stream (in addition to Wilson, which had already been built), and reservoirs on the tributaries.

*Uses of the Dams.*

The dams on the tributaries, as outlined in House Document 328, and as shown in the evidence, are used and to be used for flood control, water regulation, power and purposes of national defense. Of the completed dams, Norris is so constructed as to be able to retain the entire flood waters of the Clinch in flood season, and was in fact so operated in 1936 and 1937. In 1936 it averted a probable flood at Chattanooga. It also generates power. Releases of water from Norris in the dry season are now used for regulation of stream flow so as to maintain a seven-foot navigable channel throughout the summer. Similar releases will be necessary until the entire series of main-stream dams as planned has been completed. Wheeler backs the water of the Tennessee into a slack water pool providing nine-foot navigation to Guntersville. It generates power and has a surcharge usable for flood control. It is uncontradicted that the releases from Norris and Wheeler, and from Hiwassee, Guntersville and Chickamauga, as planned, create and will create extra head for continuous water power at Wilson, and

thus aid in the national defense. Cf. Ashwander v. Tennessee Valley Authority, supra.

Of the dams under construction, Guntersville, Chickamauga, and Pickwick Landing are essential to the maintenance of nine-foot navigation. Each of these dams is equipped with electric generators and has a substantial surcharge usable for flood control. Hiwassee, on a tributary, will be used mainly for flood control and power, and for aiding Wilson Dam with water releases at dry season. Until the project is completed it will assist in regulating stream flow, thus improving navigation. Gilbertsville, while authorized by Congress, has only been investigated and surveyed. The plans for this dam have necessarily been delayed because of its size and because of the difficulty of locating suitable rock foundation. It is reasonably estimated that Gilbertsville, when completed, will supply over 4,000,000 acre feet of flood storage, and it is the most important of the series for flood control on the Ohio and the Mississippi. The Tennessee contributes materially to the flood crest on the Ohio at Cairo. Its flood flow is almost double its drainage area in relation to other feeders of the Mississippi, because of the high precipitation in the Tennessee Valley which varies from 47.5 inches per year at Knoxville to 51.2 at Paducah on the main stream. The Ohio with its tributaries, including the Tennessee, is the principal feeder to the Mississippi floods. All of the TVA dams, on both the river and the tributaries, are used so far as constructed, are planned, as shown by the official TVA reports, and are required under the statute, to be employed as an integrated co-ordinated system for the combined purposes of navigation, flood control, power and national defense.

*Conspiracy, Coercion and Unlawful Competition.*

The bill charges a conspiracy to injure or destroy the complainants' business, to compete unlawfully, to breach the complainants' existing contracts with their customers, to compel and coerce complainants to sell their plants at distress figures. It charges that the TVA has conspired with and practiced coercion upon municipalities and co-operatives to compel them to set up their own distribution systems for the purpose of selling TVA power at retail. If the record had substantiated the allegations of the bill, grave questions would have been presented. But these allegations have not been established. None of the complainants has sold its property except those covered by the contract of January 4, 1934, a contract entered into at arm's length and not even challenged by complainants as unfair. Since complainants have not sold, they have not been coerced to sell their properties, and the negotiations for sale presented in this record do not evidence acts deemed coercion under settled legal principles. No malice in law is shown on this record. The motive of officials who execute a law is immaterial, even though accompanied by a wrongful purpose. Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 145, 57 S.Ct. 407, 410, 81 L.Ed. 562.

*Unlawful Competition.*

Neither has unlawful competition been proved. The attempt to show that the Authority has endeavored to persuade complainants' customers to breach their existing contracts for purchase of power from complainants has totally failed. In every case where any of complainants has lost a customer to the Authority, the cause has been not unlawful competition, but the lawful allurement of substantially lower prices. In every such case the change of relationship has occurred at a time when no contract with any of the complainants was in existence. In fact, it is shown that the TVA does not serve the complainants' customers with direct service except as to industrials and "ceded areas." Thus the municipalities now served by the TVA in Tennessee,—Dayton, Pulaski, and Dickson, —each generated its own power or purchased power at wholesale from a non-utility prior to the time when the TVA started selling them power. The positive statement is made by officers of the Mississippi Power & Light Company, the Franklin Power & Light Company, the Holston River Electric Company, the Birmingham Electric Company, the Carolina Power & Light Company, the Appalachian Electric Power Company, the West Virginia Power Company, the Kingsport Company, the East Tennessee Light & Power Company, the Tennessee Eastern Company, and by the Southern Tennessee Power Company, that the TVA neither serves any of the customers of these utilities direct, nor any wholesale customer by whom distribution is made to any of these utilities' former customers. The TVA serves certain cities and customers formerly served by the Alabama Power Company, but all of these customers are situated or reside within certain counties called the "ceded area." In

the agreement of January 4, 1934, the Alabama Power Company contracted that its lines should be sold to the TVA within that area, and that the TVA should serve within that district and nowhere else in Alabama. The TVA is serving nowhere else in Alabama except within this area. The Mississippi Power Company has made a similar contract with the TVA, and the TVA is not serving outside of the "ceded area" in Mississippi except to municipalities which previously maintained their own generating and distribution systems. No fraudulent attempt has been made to secure complainants' markets. Whatever compulsion exists is the inevitable compulsion exercised by the fact that a competitor sells at lower rates than complainants. But if the operation of the TVA is legal, the complainants have no legal right not to be subjected to such competition even though it curtail or destroy their business. Alabama Power Co. v. Ickes, 58 S.Ct. 300, 82 L.Ed. ——, decided January 3, 1938.

### Conspiracy with Public Works Administration.

The complainants allege that the defendants have conspired with the Public Works Administration to finance the construction of duplicating distribution lines and systems in various municipalities and co-operatives for the purpose of using TVA power and selling that power at rates so low as to constitute competition destructive to complainants' business. Numerous contracts are introduced in evidence between the Public Works Administration and municipalities and co-operatives, providing for the financing of electrical distribution projects. The power is being sold, or is contracted to be sold, to these municipalities and co-operatives at wholesale by TVA.

The facts do not establish a conspiracy. It is not questioned that loans were made within the provisions of the Public Works Administration statute, 40 U.S.C.A. § 401 et seq. The validity of that statute is not attacked in this proceeding, and we therefore assume that it is valid. The acts done by Secretary Ickes and his subordinates have been done under the purview of the controlling statute. Their acts are presumed to be valid. Where no fraud, malice, or coercion is shown, co-operative action by two groups of public officials in administering the provisions of two statutes, does not constitute conspiracy. The decisions relied on by complainants with respect to unlawful concert, plan or design, involve a plan either to commit an unlawful act or to commit acts otherwise lawful with the intent to violate a statute, or commit an unlawful act. Cf. Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. The acts done by the officials of the Public Works Administration in co-operation with the officials of the TVA, as shown by this record, were done with the intent to carry out the provisions of the Public Works Administration statute; the acts done by the TVA in co-operation with the Public Works Administration were done with the intent to carry out the TVA statute. Intent to execute a valid and existing law is not evidence of illegality. As to the transactions of the Public Works Administration, no evidence of conspiracy is presented.

### Coercion upon Municipalities and Co-Operatives.

Certain officials and employees of the TVA gave information, counsel and encouragement to municipalities and co-operatives at the request of such municipalities and co-operatives with respect to the general feasibility of setting up distribution systems for TVA power. The decision on such matters was made by the municipality or co-operative concerned. Under the statutes of Alabama, Tennessee and Mississippi, hereinafter cited, both municipalities and rural co-operatives are authorized to construct generating plants and distribution systems for the purpose of creating and distributing electric energy. Georgia has a similar statute concerning co-operatives. These cities and co-operatives were free to obtain information and counsel from any source. In each case the decision of the municipality involved was made either by the citizens at an election, or by its duly elected officers. The decision of the co-operatives involved was made by its lawful representatives. Presentation by the Authority of facts as to TVA rates and contracts for power given to citizens or officers of a city or rural co-operative at their request do not constitute intimidation or coercion.

### Damage.

The record shows that the sales of every one of these complainants and the proceeds of these sales have reached an all-time high in recent years. Several of the most important complainants have recently extended their lines, built new plants, and acquired new equipment. The Authority con-

cedes that it sells, or intends to sell, power at substantially lower rates, residential, industrial, and rural, than those of the complainants, and that some displacement of service will result. 250 miles is the distance within which electricity can feasibly be transported from each of the dams. As a result of the lower TVA rates, cities which formerly purchased power from some one of the complainants have taken steps to finance the construction of distribution systems, or have negotiated with the power companies to purchase the existing systems of the power companies, in many instances securing financial aid from the Public Works Administration with the express purpose of selling TVA power through the systems thus acquired. The city of Memphis has issued bonds for this purpose, and under the contract which the city has signed with the Authority, the Memphis Power & Light Company will be deprived of its greatest outlet. A similar proposition has been made, but not yet carried through, in Knoxville. If the arrangement is consummated, the Tennessee Public Service Company and the Carolina Power & Light Company will each be deprived of one of its most profitable customers. A similar situation exists in Chattanooga. The rural co-operatives distribute TVA power, but for the most part they reach areas not formerly served by these complainants. The Monsanto Chemical Company of Alabama discontinued certain of its operations at Anniston, Alabama, heretofore served by the Alabama Power Company. An affiliated company, Monsanto Chemical Company of Delaware, set up a substitute plant at Columbia, Tennessee, near a source of its raw material, using power purchased from TVA. The Volunteer Portland Cement Company failed to renew its contract with Tennessee Public Service Company and, instead, entered into a contract with the Authority, a contract since assigned to the city of Knoxville.

In view of the inevitable effect of the lower rates of the TVA within this area, and the economic necessity forced upon the complainants of lowering their rates to meet the competitive rates of the Authority, we conclude that the record presents evidence of substantial future damage to these complainants. But such damage constitutes damnum absque injuria unless sales of power by the TVA are unlawful. Alabama Power Co. v. Ickes, supra.

We find in this record no coercion, conspiracy, malice or fraud on the part of the defendants. None existing, the operation of the Authority is lawful unless (1) the defendants are exceeding their statutory authority or (2) the statute is unconstitutional.

### Compliance with the Statute.

Section 9a of the statute, as added by Act Aug. 31, 1935, § 5, 16 U.S.C.A. § 831h—1 reads as follows:

"The Board is hereby directed in the operation of any dam or reservoir in its possession and control to regulate the stream flow primarily for the purposes of promoting navigation and controlling floods. So far as may be consistent with such purposes, the Board is authorized to provide and operate facilities for the generation of electric energy at any such dam for the use of the Corporation and for the use of the United States or any agency thereof, and the Board is further authorized, whenever an opportunity is afforded, to provide and operate facilities for the generation of electric energy in order to avoid the waste of water power, to transmit and market such power as in this chapter provided, and thereby, so far as may be practicable, to assist in liquidating the cost or aid in the maintenance of the projects of the Authority."

It is the principal contention of the complainants that this statute is a sham, pretense, and fraud, and these dams as built and planned cannot and will not be operated within the statute. We therefore consider the actual operation of the dams.

In Water Bulletin No. 1, dated June 30, 1936, adopted by the TVA Board, it was ordered that the reservoirs of the Authority be operated "First, to serve as navigation channels and maintain navigation depths in the reaches of the river below the reservoirs; and Second, to reduce the magnitude of flood peaks below. Requirements for the control of malaria and temporary needs of construction shall be given due consideration. So far as consistent with the above procedure, as much water power available at the dam shall be converted into electricity as is feasible."

The complainants contend that this order is a sham, and that none of the dams can be or will be operated in compliance therewith. They direct a particular attack upon Norris, which is now completed and in operation. However, Water Bulletin No. 2, dated June 30, 1936, ordered

that until further notice water be released from Norris reservoir so as to maintain as nearly as may be a constant flow at Florence, Alabama, of 15,000 c. f. s. The evident purpose was to maintain a constant and sufficient stream flow for Wilson Dam. This and succeeding water bulletins, which are in evidence, outlining the same general policy, have for one of their main purposes the increase of continuous water power at Wilson. Hence, operation of the dams above Wilson is clearly constitutional under the national defense powers of the Congress.

With reference to the general operation, a resolution of the TVA Board, adopted July 1, 1936, created a committee on water control operations, consisting of the chief water control planning engineer and the chief electrical engineer, which committee was and is authorized to prepare general regulations as to the control of water through the operation of reservoirs. The regulations are transmitted to the general manager in the form of bulletins, and at times of flood or emergency, oral instructions are also given. Woodward, the chief water control planning engineer, testified that he prepares these bulletins and that none is issued without his approval. He stated that he was guided in his operations by the statute, and that the constant flow of 15,000 c. f. s. was maintained at Florence, Alabama, for the purpose of securing the necessary navigable depth in the river. Karr, electrical engineer at Norris, testified that if the limited instructions given to him for operation were such that he had either to violate the instructions or to leave a city without power, "some one would have to go without power temporarily." Woodward testified that he permits the use of the water for power, and in special cases, if extra water is wanted, it is given extra consideration. It is uncontroverted that the water control planning engineer is in direct charge of the regulation of water flow, and also that he regulates water flow from Norris primarily for navigation and flood control.

It appears that in actual operation there is a seasonal drawing down of Norris Dam so that extra storage space may be available during the flood season. Norris was actually operated during the flood of 1937 to reduce the crest on the Tennessee River and to reduce the crest on the Ohio at Cairo. The complainants' expert Kurtz was familiar with the fact that Norris was so operated. Power is produced at Norris. The defendants introduced detailed testimony as to the full amount of TVA power presently produced, the available facilities for generation, the possibilities for future generation, the present load and the load now contracted for.

Complainants urge that the estimated future TVA load set forth in the various TVA reports, and the load it may reasonably be expected to acquire because of its substantially lower rates, will demand that the dams built and to be built be operated in violation of the statute and not (as required in section 9a) in the primary interest of navigation and flood control. But this point is completely refuted by the numerous TVA contracts which are in evidence and are described in the findings of fact.

These contracts generally contain a clause relieving the Authority of any obligation to supply power when prevented by fire, accident, breakdown, act of God, or any other causes beyond the Authority's control. Substantially all of these contracts contain the following provision: "Subject to the provisions of the Tennessee Valley Authority Act of 1933 as amended, the parties hereto agree as follows * * *." Under the familiar rule, this provision reads the statute, including its mandatory requirement that the dams and reservoirs be operated primarily for flood control and navigation, into every one of these contracts. Under the contracts with the Arkansas Power and Light Company, the Victor Chemical Works, the Aluminum Company of America dated July 20, 1937, and with the Electro-Metallurgical Company, which are contracts both for firm and secondary power, the Authority is expressly relieved of obligation to supply power when service is interrupted or suspended by reason of floods or back-water caused by floods.

Reading these contracts in conjunction with the statute and the general resolution governing water control above described, it is evident that the long-term contracts of the Authority strongly corroborate (1) the sincerity of the resolution and water bulletins establishing the system of water control in the interest of flood control and navigation; (2) the testimony of Woodward and Karr; (3) the uncontradicted

facts as to the principles applied in the actual operation of the dams. The overwhelming weight of the testimony supports defendants' contention that the mandatory provision of the statute that navigation and flood control be given primary consideration both at the other dams, built and planned, and at Norris Dam, is at all times scrupulously followed and that the statute is neither violated nor exceeded.

### Constitutionality of TVA Statute must be Determined.

Since no fraud, coercion, conspiracy or malice is shown, and since the Authority has acted within the provisions of the statute under consideration, unless the statute itself is unconstitutional the dams are lawfully erected, the energy is lawfully created, and the water power is the property of the United States. Ashwander v. Tennessee Valley Authority, supra. It therefore is essential to the decision of the case pleaded in the bill to determine the constitutionality of this statute.

### The Statute.

The complainants contend that the statute was enacted primarily for power purposes, and that flood control, navigation, and national defense are incidental and merely a cloak for the unlawful purpose of permitting the government to enter the power business. The defendants contend that the statute was passed and that dams were erected and are under construction, or were authorized, for the purpose of combined flood control, navigation, and national defense; and that the installation of generators, the creation of power and its sale, have been authorized by the Congress as an incident to the exercise of constitutional powers.

### National Defense.

■ Article 1, section 8, clause 1 of the Constitution of the United States, provides that the Congress shall have power "to * * * provide for the common Defence and general Welfare of the United States."

In pursuance of this power it may make all laws which shall be necessary and proper for carrying into execution the national defense powers. An express purpose of the Tennessee Valley Authority Act is that of maintaining the properties owned by the United States in the vicinity of Muscle Shoals, Alabama, in the interest of national defense. The amended Tennessee Valley Authority Act, § 17, Title 16 U.S.C.A. § 831p, provides that "The Secretary of War, or the Secretary of the Interior, is hereby authorized to construct * * * a dam in and across Clinch River in the State of Tennessee, which has by long custom become known and designated as the Cove Creek Dam, together with a transmission line from Muscle Shoals, according to the latest and most approved designs, including power house and hydroelectric installations and equipment for the generation of power, in order that the waters of the said Clinch River may be impounded and stored above said dam for the purpose of increasing and regulating the flow of the Clinch River and the Tennessee River below, so that the maximum amount of primary power may be developed at Dam Numbered 2 and at any and all other dams below the said Cove Creek Dam."

In compliance with this provision, Norris Dam was built and is being operated to create extra head of water power at Wilson Dam. This means that constitutional authority to construct Norris exists in addition to the congressional power to authorize the construction of this dam under other clauses of the Constitution of the United States.

### Navigation and Flood Control.

The Constitution of the United States, article 1, § 8, cl. 3, provides that the Congress shall have power to regulate interstate commerce. Commerce includes navigation. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23. Congressional control of navigable waters embraces flood control.

The statute on its face repeatedly stresses navigation and flood control. The purpose clause of the act reads:

"To improve the navigability and to provide for the flood control of the Tennessee River; to provide for reforestation and the proper use of marginal lands in the Tennessee Valley; to provide for the agricultural and industrial development of said valley; to provide for the national defense by the creation of a corporation for the operation of Government properties at and near Muscle Shoals in the State of Alabama, and for other purposes." 48 Stat. 58.

The first section of the enactment, 16 U.S.C.A. § 831, creates the Authority for the purpose of maintaining and operating properties owned by the United States in the

vicinity of Muscle Shoals in the interest of the national defense and "to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." The board of the Authority is given power, section 4(j), as amended, 16 U.S.C. A. § 831c(j) "to construct such dams, and reservoirs, in the Tennessee River and its tributaries, as in conjunction with Wilson Dam, and Norris, Wheeler, and Pickwick Landing Dams * * * will provide a nine-foot channel in the said river and maintain a water supply for the same, from Knoxville to its mouth, and will best serve to promote navigation on the Tennessee River and its tributaries and control destructive flood waters in the Tennessee and Mississippi River drainage basins." Other sections in which the purposes of navigation and flood control are stressed are sections 13, 18, 23, and section 26a, as added by Act Aug. 31, 1935, § 11, 16 U.S.C.A. §§ 831l, 831q, 831v, 831y—1. The most important section is 9a, 16 U.S.C.A. § 831h—1, heretofore quoted, which governs the operation of any dam or reservoir, in the possession and control of the board, and requires the board to regulate the stream flow primarily for the purposes of promoting navigation and controlling floods. Numerous specific provisions of the statute relate to the generation and sale of electric power for the purpose of assisting in liquidating the cost of these projects, but all of them are limited and controlled by this general provision in section 9a.

Under the statute, therefore, the generation of electric energy is specifically required to be incidental to the exercise of constitutional powers under the interstate commerce clause, and the operation complies with this requirement. The record shows that the dams are adapted by their construction to combined use for flood control and improved navigation, and to generate electricity. All experts agree that the pondage at each of the dams on the main river and also at the storage dams on the tributaries can be drawn down, and that space thereby made available is capable of being used to store flood waters in the rainy season. It appears from the uncontroverted testimony that the erection of the main-river dams will create a nine-foot navigable channel. We find from the weight of the evidence that Norris has been used for the purpose of controlling floods. These facts are not controverted, except by opinion evidence.

Certain expert witnesses, in answer to hypothetical questions, stated that the dams might be operated for the primary purpose of power. Thousands of pages of testimony and numerous exhibits were introduced to show that Congress might have adopted a better plan than the TVA Unified System. Experts equally qualified testified to the contrary.

The court is of opinion that the relative value of these various plans is immaterial, since it has been established that the TVA project is reasonably adapted to use for combined flood control, navigation, power and national defense, and that in actual operation the creation of energy is subordinated to the needs of navigation and flood control.

In short, the contention that the statute and the unified project authorized therein are a sham and pretense is without foundation. It cannot be disputed that the river is navigable and that it occupies a strategic position with relation to floods, both within its own drainage area and on the Ohio-Mississippi. We are not at liberty to conclude that the river is not susceptible of development as an important waterway, nor that it cannot be regulated so as to assist substantially in the control of floods in the alluvial valley of the Mississippi as well as practically eliminating local floods on the Tennessee River. Ashwander v. Tennessee Valley Authority, supra. Norris will create additional power for use for purposes of national defense at Wilson. Hence, we are not at liberty to conclude that the Congress has not undertaken this specific development for purposes within its constitutional powers, nor that the construction of these high dams and reservoirs along the lines proposed is not an appropriate means to accomplish these legitimate ends. Cf. Ashwander v. Tennessee Valley Authority, supra. The dams and their power equipment, both constructed, under construction and authorized, must be taken to have been authorized, constructed and planned in the exercise of the constitutional functions of the Government.

*Interference with States' Rights.*

Complainants contend that the TVA statutes constitute an unlawful interference with the police power of the states because they regulate the rates of utilities

which themselves are subject to state regulation. The statute does not fix, nor purport to fix, the complainants' rates. But the contention is that the lower rates of the TVA will inevitably force complainants to lower their rates, and also that the TVA in its operations is not subject to the police power of the state.

The Authority operates within four of the nine states in which these complainants do business, namely, Tennessee, Alabama, Mississippi, and Georgia, its contracts with cities and co-operatives in Tennessee, Alabama and Mississippi being authorized by express legislation. All municipalities in these three states have the statutory power to own and operate electric distribution systems. General Laws of Mississippi 1936, c. 185; Carmichael Act, Alabama Code Supp.1936, § 2001 (1) et seq.; Public Acts of Tennessee 1935, c. 32, Tennessee Code, § 3708 (1) et seq. In Mississippi, Tennessee and Alabama, municipalities are expressly authorized to contract for TVA power and to make agreements with TVA as to resale rates. Chapter 271, General Laws of Mississippi 1936; chapter 37, Public Acts of Tennessee 1935, Tennessee Code, § 3708 (96) et seq.; Alabama Code Supp.1936, § 687 (62). In Mississippi, Tennessee and Alabama, non-profit membership corporations such as rural co-operatives may operate electric systems, purchase from TVA, and make contracts as to re-sale rates. This is also true in Georgia, where the North Georgia Membership Corporation is alleged to compete with the Tennessee Electric Power Company. Chapter 184, General Laws of Mississippi 1936; Chapter 231, Public Acts of Tennessee 1937, which is an amendment of the Electric Membership Corporation Act of 1935, Pub. Acts 1935, Ex. Sess., c. 32; Alabama Code Supp. 1936, § 687 (18) et seq.; Georgia Laws 1937, p. 644.

The Supreme Court of Alabama has upheld the validity of the Carmichael Act, section 2001 (1) et seq., Alabama Code Supp.1936, in Oppenheim v. Florence, 229 Ala. 50, 155 So. 859. The similar act relating to co-operatives was sustained by the Supreme Court of Alabama in Alabama Power Co. v. Cullman County Electric Membership Corp., 234 Ala. 396, 174 So. 866. In Tennessee the Supreme Court has upheld the right of the cities of Memphis and Chattanooga to buy TVA power and to establish their own electric systems under special laws. Memphis Power & Light Co. v. Memphis, Dec. term, 1936, 112 S.W.2d 817; Tennessee Electric Power Co. v. Chattanooga, Dec. term, 1936, 114 S.W.2d 441; Tennessee Public Service Co. v. Knoxville, 170 Tenn. 40, 91 S.W.2d 566.

The actions which the complainants attack are authorized by the states themselves. It is strange doctrine that acts authorized by a sovereign state constitute interference with its sovereign rights because of the fact that they are also authorized by the Federal Government. We think that deliberate co-operation between the state and the United States, authorized in each case both by the state legislature and by the Congress, constitutes no abdication of any state right.

■ Moreover, no state has intervened as a party in this proceeding to protest that its laws are violated by the TVA, and no regulatory commission is a party to this action. These complainants are not authorized to object on behalf of the states. Georgia Power Co. v. Tennessee Valley Authority, D.C., 14 F.Supp. 673, 676. Questions of the conflict of the TVA statute with the sovereign power of the states are not properly raised until the interested parties are before the court. Georgia Power Co. v. Tennessee Valley Authority, supra. The TVA statutes do not violate either the Ninth or the Tenth Amendment to the Constitution of the United States.

■ Since the United States has acquired these dam sites and constructed these dams legally, the water power, the right to convert it into electric energy, and the energy produced constitute property belonging to the United States. Ashwander v. Tennessee Valley Authority, supra. This electric energy may be rightfully disposed of by the United States through the action of the Congress, under section 3 of article 4 of the Constitution of the United States. Ashwander v. Tennessee Valley Authority; supra. Since floods frequently recur, and the needs of navigation are continuous, hydro-electric power generated at dams which control floods and improve navigation is continuously created, and the Government may adopt any appropriate constitutional means of disposing of the property. It is not limited in such disposition to a few, or to infrequent transactions. This is the inevitable logic of the Ashwander decision, supra, 297 U.S. 288, at page 315, 56 S.Ct. 466, 468, 80 L.Ed. 688,

in which every kind of electric facility, many miles of distribution and transmission lines and continuous and permanent operation were called in question because the contract attacked in that case was the contract of January 4, 1934, in which certain of these complainants, for valuable consideration, ceded sixteen counties to the TVA for electric service.

While the Government, in selling property of the United States, performs many functions that would be performed in the operation of a private business trading in similar property, inasmuch as the energy sold is created at dams lawfully erected within the Federal power, the Government in performing these functions is not entering into private business. It is merely using an appropriate method of disposing of its property. The Government may sell land belonging to the United States in competition with a real estate agency, carry parcels in competition with express companies, and manage and control its thousands of square miles of national parks even as a private company. The Government has an equal right to sell hydro-electric power, lawfully created, in competition with a private utility. There is no constitutional authority which denies the Government the right to seek a wider market (Ashwander v. Tennessee Valley Authority, supra), and the transmission and distribution lines erected are a proper facility for conveying the property of the United States to the market. The creation of the Authority is appropriate. The disposition of the energy is continuous and constant, and it is appropriate that a continuing agency be created in order to carry out this legitimate federal function.

We conclude that, since none of the complainants claims to operate under an exclusive franchise; since no fraud, malice, coercion, or conspiracy exists; since the Authority is not exceeding its statutory powers, and since the statute is constitutional, the competition with these complainants is lawful. It follows that the holding in Alabama Power Co. v. Ickes, supra, recently decided, squarely applies. These complainants have no immunity from lawful competition, even if their business be curtailed or destroyed.

A decree will be entered denying the injunction sought, dismissing the bill of complainants, and taxing costs against the complainants. Findings of fact and conclusions of law will be filed.