UNITED STATES of America upon the relation and for the Use of the TENNESSEE VALLEY AUTHORITY, Plaintiff,

v.

AN EASEMENT AND RIGHT–OF–WAY OVER TWO TRACTS OF LAND, Each 150 Feet Wide, One 2,743 Feet Long and the other 1,565 Feet Long IN LOGAN COUNTY, KENTUCKY, Enlow Rogers et ux., Defendants.

No. 809.

United States District Court
W. D. Kentucky,
Bowling Green Division.

Sept. 13, 1965.

Charles J. McCarthy, Gen. Counsel, Thomas A. Pedersen, Asst. Gen. Counsel,

Lewis E. Wallace, William W. Hurst, Knoxville, Tenn., John C. Lovett, Benton, Ky., for plaintiff.

J. Granville Clark, Russelville, Ky., for defendants.

SWINFORD, District Judge.

The plaintiff filed this action on August 31, 1961 and it was, by order of the court, put in possession of the property condemned. Commissioners were appointed to assess adequate compensation to the landowners. Before the report of the commissioners, the landowners filed a motion to vacate the order of taking and to dismiss the complaint. This motion raised the question of the sufficiency of the allegations of the complaint and the legality of the declaration of taking. It was contended that the complaint showed on its face that the plaintiff was without authority to condemn and the court without authority to order a taking by reason of the provisions of the Tennessee Valley Authority Act of 1933, 48 Stat. 58, as amended, 16 U.S.C. §§ 831–831dd (1958; Supp. I, 1959). The court heard arguments in support of the motion to dismiss and denied the landowners' motion, thereby, as the trial court then believed, finally adjudicating the authority for the plaintiff to acquire the property under a constitutional act of Congress.

Commissioners appointed by the court held hearings and made a finding as to the value of the property, which was, on appeal to the district court, reviewed by a three-judge court as required by the Act. The court modified the award and a final judgment was entered.

On appeal to the Court of Appeals for the Sixth Circuit from the judgment of the district court, the amount of the award was affirmed, 336 F.2d 76, but the case was remanded for further consideration on the question as to whether the electrical generating plant known as the Paradise plant from which the transmission line passes over the acquired property "is connected with, auxiliary to, or aids the distribution of electricity generated at any TVA hydro-electric plant."

In overruling the landowners' motion to dismiss the complaint, this court held that 16 U.S.C. § 831c(i) authorized the taking of the property along the Tennessee River and its tributaries and that 16 U.S.C. § 831k authorized construction of power lines within transmission distances of TVA operated plants. The court relied upon its former decision in United States ex rel. Tennessee Valley Authority v. Puryear, W.D.Ky., 105 F. Supp. 534 (1952), which authorized TVA to construct facilities outside the Tennessee River and its tributaries.

In remanding this case for further consideration and final judgment on the question of the "authority" for the taking, the Court of Appeals for the Sixth Circuit said:

> "We are not advised as to whether the Paradise plant is connected with, auxiliary to, or aids the distribution of electricity generated at any TVA hydro-electric plant. It is not clear to us whether TVA is here contending that it has authority to construct a steam plant at any place within 1,000 miles of one of its admittedly authorized hydro-electric plants, and therefrom distribute electricity."

United States ex rel. Tennessee Valley Authority v. Easement in Logan County, Ky., 6 Cir., 336 F.2d 76 (1964).

This court directed the parties to offer evidence in support of their respective positions on this question. The plaintiff submitted the deposition of Mr. G. O. Wessenauer. The landowners offered no proof. The deposition of the witness, Wessenauer, was filed with the record and the following facts are adduced from the deposition.

TVA owns and operates a number of steam plants, several of which were included in property transferred to TVA by local utilities owners. Other plants were built by TVA on authority to build such plants from the provisions of the original TVA Act wherein Congress understood that additional steam plants would be built. It was under this authority that the Paradise and Bull Run steam plants were built and financed by the Revenue Bond Amendment of 1959. The Paradise plant operates as a part of the entire power system as indicated by a map which was used by the House Committee on Public Works when considering the revenue bond amendment. The map, which is filed with the record as Exhibit 1 in the deposition of Mr. Wessenauer, illustrates the Tennessee River drainage area and the TVA service area. The dams and steam plants are operated as an integral part of the system and are inter-connected by a high voltage transmission network. The system is also connected to adjacent power facilities and this forms a network which feeds the power output of all the projects and makes up a pool of power upon which the municipalities, cooperatives, industries and various power users may draw for supply. Exhibit 2, filed with the deposition, gives a comprehensive picture of the entire power line network.

The best result in supplying power is the use of a combination of hydro-electric plants and steam plants, since they complement and supplement each other. The increasing power needs of the TVA region necessitated the construction of the Paradise steam plant which was placed at that location (Paradise, Kentucky) in order to supply current from the most economical source to a particular region. The decision was based on economic factors and engineering technical knowledge. Among the economic factors were the availability of coal, the cost of the connecting facilities, the adequacy of a cooling water supply, the availability of rail, water and road transportation, and, from the standpoint of the engineers, the suitability of foundation conditions. The placement at this location effected a two-thirds cost saving in coal in comparison with placement anywhere else in the TVA system. The TVA board of directors made the ultimate decision after taking the things to which I have referred and possibly other factors into consideration.

The Paradise plant transmission lines serve a number of purposes. They are

a part of the overall network of transmission lines. They carry power from the plant further into the network and serve as alternate or additional routes when power is needed from Kentucky plants to Tennessee. They also serve as routes for power to supply Paradise and its loads when needed and when the loads grow and develop in the Paradise area, they will be used to supply new sub-stations that will be needed.

■ It is the opinion of the court that the testimony of this witness supplies the necessary proof required by the Court of Appeals and that it shows conclusively that the condemnation of the Enlow Rogers property was authorized by the TVA legislation. It is convincing that the transmission lines over the Rogers property did aid, were auxiliary to or connected with the distribution of power from TVA plants.

If the landowners contend that the Paradise plant violates 16 U.S.C. § 831n–4(a), the result would be the same. This statute restricts TVA sale or delivery of power area to that area served on July 1, 1957. Exhibit 1, the map introduced by Mr. Wessenauer, shows that the Paradise plant is within the July 1, 1957 service area of TVA. However, if the plant were outside the service area, the statute allows for extensions not more than five miles around the periphery of the service area if necessary to care for the growth of TVA and its distributors within the area. See 1959 U.S.Code Cong. & Adm. News, p. 2006.

■ The statute only restricts TVA from entering into contracts for the sale and delivery of power so as to make TVA a source of power outside the area. This does not preclude TVA from constructing facilities outside the area to provide sources of power to be used inside the area. It is clear from the testimony of the witness that the Paradise plant was erected to provide a low cost power source for the TVA service area and to operate as an integral part of the network of TVA transmission lines.

It is the opinion of the court that the Paradise-North Nashville No. 1 (East) Transmission Line serves an authorized TVA purpose. Findings of fact and conclusions of law are this day filed. Final judgment may be submitted by the attorneys for the plaintiff.

Pursuant to the order of the Court of Appeals rendered on August 27, 1964, 6 Cir., 336 F.2d 706, remanding the case to this Court for further proceedings consistent with the Court of Appeals' opinion on the sole question of whether plaintiff had authority to take the property condemned herein, this case came on for further hearing upon the entire record, the pleadings, proof, briefs and arguments of counsel, from all of which the Court makes the following determinations:

FINDINGS OF FACT

1. On August 31, 1961, plaintiff filed a complaint and declaration of taking to acquire an easement and right-of-way across defendants' property in Logan County, Kentucky, for a portion of an electric power transmission line connecting the Tennessee Valley Authority (hereinafter called "TVA") Paradise Steam Plant, located on the Green River in Muhlenberg County, Kentucky, near the Town of Paradise, and a TVA substation at Nashville, Tennessee. This transmission line has been designated by TVA as the "Paradise-North Nashville No. 1 (East) Transmission Line" and is one of the seven transmission lines which connect the Paradise Steam Plant with other portions of the TVA electric power system.

2. Prior to the institution of the proceedings herein, the TVA Board of Directors adopted a resolution authorizing construction of the Paradise Steam Plant at the location specified above, and a further resolution authorizing the institution of condemnation proceedings for acquisition of the transmission line easement and right-of-way here involved as necessary for carrying out the purposes of the TVA Act.

3. TVA is a wholly owned corporate agency and instrumentality of the United States, created by the Tennessee Valley Authority Act of 1933 (48 Stat. 58, as

amended, 16 U.S.C. §§ 831–831dd (1958; Supp. V, 1959–63)). Its broad statutory responsibilities relate to improving the navigability and controlling the flood waters of the Tennessee River; development of the natural resources of the region, including reforestation and proper use of marginal lands; agricultural and industrial development of the region; and the national defense. In the carrying out of these responsibilities, it is necessary and appropriate that it acquire real estate, easements and rights-of-way, and such other interests in land as may be needed; that it build dams, reservoirs, power houses, steam plants, and other structures; and that it construct a system of transmission lines to interconnect these facilities for the generation of electric power and to market the electricity.

4. In 1961 the TVA power system consisted of a series of dams on the Tennessee River and its tributaries constructed by TVA; Wilson Dam which was built under the National Defense Act of 1916 and transferred to TVA by section 7 of the TVA Act; and a number of dams built by private power companies and purchased by TVA in 1939, one of which was outside of the Tennessee Valley. It also included nine major steam plants built by TVA (including Paradise Steam Plant then under construction) and a number of minor steam plants which were acquired by purchase (except Wilson Steam Plant, which was constructed under the National Defense Act of 1916 and transferred to TVA by section 7 of the TVA Act). By agreement with the Aluminum Company of America, TVA receives the electrical output of the Aluminum Company dams on the Little Tennessee River and its tributaries. By agreement with the Corps of Engineers and the Southeastern Power Administration, it receives the output of dams constructed by the Corps of Engineers on the Cumberland River and its tributaries. The various power installations are interconnected by a network of transmission lines as shown on the map filed as Exhibit 2 to the deposition of G. O. Wessenauer.

5. A large part of the TVA transmission system is located outside of the Tennessee Valley. This is necessary to enable TVA to carry out its statutory responsibilities.

6. In 1939 TVA purchased the generating and transmission facilities of the major private utilities within the area now supplied by TVA. At that time the TVA Act was amended by the addition of section 15c which authorized the issuance of bonds by TVA to finance the acquisition. At the time this amendment was passed, Congress understood that TVA was assuming a utility responsibility for the area and that eventually it would be necessary to build steam plants to carry out that responsibility. Among the facilities acquired by TVA from private companies were steam generating plants at Memphis and Nashville, Tennessee, and Bowling Green, Hopkinsville, and Mayfield, Kentucky, and transmission facilities in and extending to these and other points outside the Tennessee Valley.

7. The selection by the TVA Board of a site for a new steam plant is determined by many economic and engineering considerations including, among others, such factors as the availability of fuel, the cost of transmitting power through the transmission network, the adequacy of the supply of cooling water, the availability of transportation facilities, and the suitability of foundation conditions.

8. Of the steam plants built by TVA, three are located outside the Tennessee Valley—Shawnee, Gallatin, and Paradise. Congress appropriated funds for the construction of both Shawnee and Gallatin after having been advised of the projected locations for the plants. No funds were appropriated for the Paradise Steam Plant since it was financed from revenues and the sale of bonds.

9. The TVA system of dams and reservoirs provides a navigation channel from the mouth of the Tennessee River to Knoxville, Tennessee, and a substantial amount of flood control on the Tennessee River and the lower Ohio and Mississippi Rivers. This is a multipur-

pose system which produces electric power in addition to providing navigation and flood control. The hydro plants and the steam plants in the TVA system complement and supplement each other, and the best over-all operation is obtained by using steam plants to serve the around-the-clock portions of the load and using the hydro power to serve the variable portions. Due to the variations in rainfall and other hydro-logical conditions, much of the hydro power is not available on an around-the-year basis. In TVA's combined operation of hydro and steam power, the steam power upgrades the hydro power and makes it more valuable.

10. The construction and operation of steam plants is an appropriate and integral part of the development of the Tennessee River for navigation, flood control, the production of power, and related purposes.

11. The Paradise-North Nashville No. 1 (East) Transmission Line is an appropriate and integral part of the TVA transmission network. On occasion it will carry not only steam power, but hydro power, and power received from neighboring utilities with which TVA has interconnections.

12. The Paradise Steam Plant and the Paradise-North Nashville No. 1 (East) Transmission Line are both within transmission distance of some of the TVA dams.

13. In 1961, approximately 45 percent of TVA's total electrical output was sold to other governmental agencies for purposes directly related to national defense, including operation of the Atomic Energy Commission's installations at Oak Ridge, Tennessee, and Paducah, Kentucky, the Air Force Research Center at Tullahoma, Tennessee, the Redstone Arsenal at Huntsville, Alabama, and the Marshall Space Center at Huntsville, where the Saturn missile was fabricated. TVA itself used a large block of power at its Muscle Shoals chemical plants which are used to make fertilizer in peacetime and munitions in times of war. In 1945 about three-fourths of TVA's total electrical output was used for war production purposes either directly by defense establishments or by defense-related industries, and during that year TVA supplied about 10 percent of the nation's power that went into war production.

14. At the time TVA decided upon the construction of the Paradise plant, it was supplying 28.5 billion kilowatt hours annually to federal defense establishments, and there were prospects that the requirements of those agencies would increase within the next few years. This was one of the factors that led to the decision to build the Paradise plant.

15. In 1961, of the portion of TVA's power output which was not needed by federal agencies, some went to large industries, mostly aluminum, chemicals, and ferro-alloys, and to adjacent private utilities. The remainder was sold at wholesale to distributors, including 155 municipalities and cooperatives and 2 private utilities, who distributed it to the thousands of farms and homes throughout the area supplied by TVA power, and to approximately 178,000 small business and industrial concerns.

16. The contracts under which TVA sells power at wholesale to distributors contain provisions to assure that the power will be distributed at rates which will promote its widest use and serve as a tool in the development of the resources of the region. These provisions cover resale rates, the places where the power is to be delivered, the physical facilities where power is to be provided, and the manner in which the distributor may use its revenues.

17. At the present time the average annual residential use in the region is 11,000 kilowatt hours, which is more than twice the national average for such use. On farms in the area, the use of electricity has multiplied 200 times in the last 30 years. Nearly 100 percent of the farms in the region now have electricity, whereas only 3 percent had electricity in 1933.

18. TVA power operations promote the development of the resources of the area in such a way as to improve the

economy of the area served by TVA power and promote the general welfare of the nation.

## CONCLUSIONS OF LAW

■ 1. The Tennessee Valley Authority is a wholly owned corporate agency and instrumentality of the United States, created by the Tennessee Valley Authority Act of 1933 (48 Stat. 58, as amended, 16 U.S.C. §§ 831–831dd (1958; Supp. V, 1959–63)). Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Tennessee Elec. Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (E.D.Tenn. 1939); Tennessee Valley Authority v. Kinzer, 142 F.2d 833 (6th Cir. 1944); Posey v. Tennessee Valley Authority, 93 F.2d 726 (5th Cir. 1937); Malone v. Tennessee Valley Authority, 86 F.Supp. 961 (W.D.Ky. 1949); Littleton v. Vitro Corp. of America, 130 F.Supp. 774 (N.D.Ala. 1955); Ramsey v. United Mine Workers of America, 27 F.R.D. 423 (E.D.Tenn. 1961).

■ 2. The basic facts as to the activities of TVA, including the development of its power program and other statutory programs, are matters of public record and common knowledge; they are contained in TVA's annual reports to Congress and are judicially known to the Court. State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); State of Arizona v. State of California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); 31 C.J.S. Evidence § 42 (1964); 20 Am.Jur. Evidence § 44 (1939); Carolene Products Co. v. United States, 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15 (1944); Palmer v. Sun Oil Co., 78 F.Supp. 38 (N.D.Ohio 1948).

3. The TVA Act imposes upon TVA broad responsibilities relating to

* * * navigability, flood control, reforestation, marginal lands, and agricultural and industrial development of the whole Tennessee Valley. The T.V.A. was empowered to make contracts, purchase and sell property deemed necessary or convenient in the transaction of its business, and to build dams, reservoirs, transmission lines, power houses, and other structures. It was particularly admonished to cooperate with other governmental agencies— federal, state, and local—specifically in relation to the problem of "readjustment of the population displaced by the construction of dams, the acquisition of reservoir areas, the protection of watersheds, the acquisitions of rights-of-way, and other necessary acquisitions of land, in order to effectuate the purposes of the Act." All of the Authority's actions in these respects were to be directed towards "development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected by the development consequent to this Act * * * all for the general purpose of fostering an orderly and proper physical, economic, and social development of said areas * * *." To discharge its responsibilities the T.V.A. was granted "such powers as may be necessary or appropriate" for their exercise [United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 553, 66 S.Ct. 715, 718, 90 L.Ed. 843 (1946) ].

■ 4. In interpreting the scope of the statutory and constitutional authority of TVA, this Court is required to construe the TVA Act liberally in order

* * * to carry out the purposes of Congress to provide for the disposition of and make needful rules and regulations respecting Government properties entrusted to the Authority, provide for the national defense, improve navigation, control destructive floods, and promote interstate commerce and the general welfare [16 U.S.C. § 831dd].

United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 66 S. Ct. 715, 90 L.Ed. 543 (1946).

5. Construction of the Paradise Steam Plant and the transmission lines connecting it with the TVA power system is authorized under the TVA Act. Rainbow Realty Co. v. Tennessee Valley Authority, 124 F.Supp. 436 (M.D.Tenn. 1954); United States ex rel. Tennessee Valley Authority v. Puryear, 105 F.Supp. 534 (W.D.Ky. 1952); United States ex rel. and for Use of Tennessee Valley Authority v. An Easement and Right-of-Way, Etc., 235 F.Supp. 376 (N.D.Miss. 1964).

6. The condemnation of the easement and right-of-way herein, which TVA deemed necessary for the construction and operation of transmission lines connecting Paradise Steam Plant with the TVA power system, is authorized by express provisions of the TVA Act. United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 553–554, 66 S.Ct. 715 (1946); Rainbow Realty Co. v. Tennessee Valley Authority, 124 F.Supp. 436 (M.D.Tenn. 1954); United States ex rel. Tennessee Valley Authority v. Puryear, 105 F.Supp. 534 (W.D.Ky. 1952).

■ 7. The necessity, expediency, location, design, method of operating, and what property is needed for the facilities which comprise the TVA system, including Paradise Steam Plant and the transmission line involved in this case, are matters for administrative and legislative determination which are not subject to judicial review. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946); Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952); State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946); United States v. Certain Real Estate, Etc., 217 F.2d 920 (6th Cir. 1954); United States v. West Virginia Power Co., 122 F.2d 733 (4th Cir.), cert.

denied, 314 U.S. 683, 62 S.Ct. 187, 86 L.Ed. 547 (1941).

■ 8. TVA's Paradise Steam Plant and the transmission lines connecting it with the TVA system are parts of an integrated system of multipurpose dams, steam plants, and transmission lines, which together improve navigation, help control floods, produce power, and serve generally to develop the Tennessee River watershed and are authorized by the commerce clause of the Constitution (Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Tennessee Elec. Power Co. v. Tennessee Valley Authority, 21 F. Supp. 947 (E.D.Tenn. 1938); United States v. Appalachian Elec. Power Co., 311 U.S. 377, 426, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Rainbow Realty Co. v. Tennessee Valley Authority, 124 F.Supp. 436 (M.D.Tenn. 1954)); make a substantial contribution to the defense needs of the nation and are authorized under the war power and defense clauses of the Constitution (United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946); United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); Clallam County v. United States, 263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328 (1923); Tennessee Elec. Power Co. v. Tennessee Valley Authority, 21 F.Supp. 947 (E.D. Tenn. 1938); and promote the development of the resources of the area served by TVA power and the general welfare of such area and of the nation as a whole and are authorized under the general welfare clause of the Constitution (United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 66 S. Ct. 715, 90 L.Ed. 843 (1946); City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945); Stew-

ard Mach. Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)).

9. The Court concludes, as a matter of law, that plaintiff has the constitutional and statutory authority to build and operate Paradise Steam Plant and the transmission line involved in these proceedings and to acquire the property described in the complaint and declaration of taking. Accordingly, proper order will be entered overruling defendants' objections to the right to take the same.