**NORTHERN CALIFORNIA POWER AGENCY et al., Plaintiffs,**

v.

**Rogers C. B. MORTON et al., Defendants.**

Civ. A. No. 74–617.

United States District Court, District of Columbia.

Feb. 14, 1975.

George Spiegel, Daniel I. Davidson, Washington, D. C., for plaintiffs.

John H. Broadley, Dept. of Justice, Washington, D. C., for defendants.

### MEMORANDUM OPINION

GESELL, District Judge.

In this action, plaintiffs [1] seek a judgment declaring unlawful rate increases promulgated by the Department of the Interior for electrical power sold to them as customers of the Central Valley Project in California hereinafter "CVP"). They also pray for an injunction prohibiting the defendants from continuing to implement such rate increases. Under the terms of an agreement between the parties, the funds which have accumulated in an escrow account since April, 1974, representing the amount of the challenged rate increase, would, following any appellate review, be returned.

It is alleged that the procedures followed by the Department prior to setting the new rates failed to comply with statutory requirements and deprived them of due process, and contended on the merits that the rates finally set are inconsistent with the applicable statutes. The procedural issues are before the Court on plaintiffs' motion for summary judgment, the material facts are not in dispute, and the issues have been thoroughly briefed and argued.

The procedural deficiencies alleged are, first, that the Department of Interior failed to comply with 5 U.S.C. § 552(a) (1)(B)–(C) in that it failed to publish in the *Federal Register* procedures to be followed in the rate-setting process; second, that the actual procedures employed by the Department were contrary to the Wunderlich Act, 41 U.S.C. § 321 *et seq.*; and, third, that the procedures were, in any event, so deficient that they denied due process.

### Background and Proceedings

CVP is a multipurpose project managed by the Bureau of Reclamation of the Department of the Interior hereinafter "Bureau" and "Department," respectively). It consists of numerous dams, hy-

---

1. The Northern California Power Agency ("NCPA"), six of its member cities and a rural electric cooperative, an associate member, have joined in this action. NCPA is a public agency created under California law and acts on behalf of its members in power supply matters.

droelectric power generation and transmission facilities and irrigation canals as described in more detail in *Ivanhoe Irrigation Dist.* v. *McCracken,* 357 U.S. 275, 279–284, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). The project is located in the Central Valley of California and in the surrounding mountains. One of the subsidiary purposes of CVP is to generate and sell electric power.

Plaintiff companies are non-profit entities which purchase power from CVP and distribute it to in excess of 80,000 retail customers in a service area with a population approaching 200,000 people. Since these concerns automatically pass along rate increases to consumers in the form of higher electrical bills,[2] the challenge to the rate increase is, in effect, on behalf of consumer-customers. Under the Federal Reclamation Laws, municipalities and rural electric cooperatives such as plaintiffs are entitled to preference in purchasing power from Bureau-operated projects. 43 U.S.C. § 485h(c). Moreover, the Department interprets its mandate as requiring it to furnish power "at the lowest possible rate to consumers consistent with sound business principles." *See* 16 U.S.C. § 825. In a general way, as applied to this case, this standard means that rates must be sufficient over a 50-year period to recoup the Government's investment in each given facility. The Department noted that CVP had not been charging rates sufficient to accomplish this recoupment and felt that an increase of some kind was essential.

As early as 1969, the Bureau began to include projected rate increases in 1975 and 1980 in its rate and repayment studies for the CVP project. In January, 1973, the Department decided a rate increase should be placed in effect and began the process which culminated in this litigation. This is the first case of

this kind in at least 30 years and the Bureau had no established procedures or practical hearing experience in the area.

The rate increase at issue in this case was promulgated by the Department in a press release dated November 1, 1973, to take effect in two stages: a 28 percent average increase effective April 1, 1974, with a second increase to follow in January, 1977. The customers who buy their power from the plaintiffs will pay between $1.75 and $2 million in additional electrical bills annually as a result of the first step of the increase.

In determining the amount of the increase the Bureau decided not to promulgate or adhere to a formal code of procedural rules to govern this and other rate proceedings. Instead, it felt that informal procedures developed on an ad hoc basis as the matter went along could better serve efficiency and "cut red tape." Since the CVP serves only 54 customers directly, face-to-face meetings between experts working on the technical phases of detailed accounting and hydrological background studies were deemed feasible.

The plaintiffs in this case received a great deal of information concerning the proposed rate increase by two methods. First, they received information which was transmitted generally to all the customers of the CVP. Second, they received extensive, detailed information in response to numerous specific requests made by them to the Department over a substantial period of time and almost continuously until decision. This information was requested in writing, orally and over the telephone and was supplied, depending on its nature, by all these means. No request for data was refused.[3] However, in view of the naturally adversarial relationship of the parties and the absence of a code of procedures to define the ground rules,

2. Statement of Gordon Estes, Chief of the Bureau's Market and Sales Branch, July 10 Hearing, (DX–2) at 19.

3. Procedures for providing information were not only informal but peculiar. As part of the process an informal hearing was held

with three California congressmen present at the Rayburn Building on July 24, 1973, involving two sessions, lasting over five hours. Information was sought and issues discussed.

the process gradually became unmanageable. Thus, a massive computer study updating hydrological data for the 1954–1971 period, a crucial input to the rate-setting process, was made available to plaintiffs' experts only *four days prior* to the deadline for submitting written comments. The Bureau has since conceded to Congress that it "goofed" in failing to define in advance clear procedures for making in-depth background materials available.[4]

On June 8, 1973, a letter was sent to all customers of CVP by the Bureau inviting them to attend an open hearing on July 10, 1973, in Sacramento, California. Interested parties were invited to express their views on the proposed rate increase and were urged to submit written statements in addition to oral presentations. An agenda was attached. Included with those letters was a 32-page brochure setting forth the Bureau's proposal. Included in the brochure was a print-out of a rate and repayment study performed for CVP in May, 1973.

On May 7, 1973, Mr. George Spiegel, one of the attorneys for plaintiffs in this proceeding, wrote to Secretary Morton requesting, among other things, that the procedures which would be used to enable interested parties to present evidence and argument be detailed. On June 1, 1973, Deputy Assistant Secretary Wilson responded to Mr. Spiegel's letter of May 7, 1973, stating in pertinent part:

We have scheduled an open hearing for the CVP on July 10, 1973. At this hearing interested representatives of our customers, such as yourselves, and other interested members of the public will be afforded the opportunity to comment on the proposed rate schedules and the studies on which they are based.

On June 25, 1973, Deputy Assistant Secretary Wilson wrote to Mr. Spiegel to clarify the nature of the July 10 hearing. Mr. Wilson stated, *inter alia*:

In answer to your specific questions regarding the scheduled hearing, sworn testimony will not be submitted and there will be no opportunity for cross-examination. The Regional Director will preside. A transcript will be made and you are free to purchase a copy from the reporter for your own use. No "initial decision" will be made as this is not a formal adversary-type proceeding. The record will be reviewed by officials of the Bureau of Reclamation and others; the final decision will be made by the Secretary.

It is apparent from your questions that you misconstrue the nature of this hearing. The sole responsibility for deciding upon the rates to be charged by the Bureau for the sale of Federal power is vested in the Secretary—43 U.S.C. 485h(c). This matter is covered by the public property and public contracts exemption to the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. 553(a)(2). No public hearing is required by law.

Nonetheless, it is our desire to afford the public a reasonable opportunity to offer comments and advice before the final decision is made. It is to this end that we have established the indicated opportunities for public information and comment.

On July 10, 1973, a hearing was held in Sacramento at which interested parties, including the plaintiffs herein, made statements and submitted written comments on the Bureau proposal.[5] The time for submission of additional written

---

4. See Statement of Asst. Solicitor Pelz, Hearings on "Power Rate Increases (Bureau of Reclamation, Central Valley Project, California)" before Subcommittee on Conservation and Natural Resources of the House Comm. on Gov. Operations, 93d Cong., 2d Sess. (Jan. 22, 1974) (Tr. 524) (PX–20(c)).

5. On-the-record questioning was not permitted. The Bureau refused to clarify basic aspects of the proposal. No specific on-the-record response to comments or questions was made at any stage, even in the final decision.

comments was extended to August 31, 1973. On November 1, 1973, after reviewing the hearing transcript and discussions with Bureau personnel, Assistant Secretary Horton announced the final rate increases for CVP by press release without stating the factors relied on or the underlying reasoning. It appears the final decision was based in part on factual considerations different from those originally advanced in support of the rate increase and subject to comment at the public hearing.

### Failure to Publish Procedures

█ The Administrative Procedure Act, 5 U.S.C. § 552(a)(1), requires "each agency" to publish in the *Federal Register* for the guidance of the public:

> (B) statements of the general course and method by which its functions are channeled and determined . . . .
> [and]
>
> (C) rules of procedure . . . .

It is undisputed that the Bureau failed to publish any such description of the procedures to be followed in these rate-making proceedings.[6] The statute clearly provides that no administrative action taken pursuant to unpublished procedures can be allowed to stand against a person adversely affected thereby. See *W. G. Cosby Transfer & Storage Co. v. Froehlke,* 480 F.2d 498 (4th Cir. 1973).

█ █ Defendants argue, however, that "actual and timely notice" of the terms of the procedures to be followed was given and therefore their actions come within the statutory exception.[7] See *Kessler v. FCC,* 117 U.S.App.D.C. 130, 326 F.2d 673, 690 (1963). The Court rejects this position. The procedures outlined informally were insufficient to satisfy the exemption. They were incomplete, imprecise and inaccurate. Where "timely" notice of "rules of procedure" is required, the statute cannot be satisfied by actual notice of the Department's improvised decisions as each new problem arises. What is contemplated is a reasonably complete code of procedures set out in advance by which actions can be guided, and strategies planned. This simply was not provided.

Moreover, at times the agency did not abide by the procedures it had notified the plaintiffs it would follow. Although plaintiffs had been repeatedly informed that the Secretary himself would make the final decision, in fact it was made by Assistant Secretary Horton, who had been involved in developing the conceptual underpinnings for the rate increase which, in part, plaintiffs' presentation sought to attack. Cf. *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

Finally, the informal explanations of the contemplated procedures left many important areas impermissibly vague and undefined. They failed to specify whether proponents of the rate increase would submit for comment all the data they relied on. Whether any formal opportunity to question the staff on their attitudes and conclusions would be provided was left unsettled until late in the day. Nothing was stated as to the form of the ultimate decision.

The Department must be more precise, timely and informative before it can take refuge in the exemption. This is particularly apparent when one considers the present proceeding was the first of its kind in many years, and involved complicated technical facts, large sums of money, and multiple parties. Congress wisely recognized after years of experience that such proceedings re-

---

6. Of course, the fact that the Department's rate-making function is exempt from the APA's informal rule-making procedures by virtue of the public property exemption, 5 U.S.C. § 553(a)(2), *see* Associated Elect. Coop. v. Morton, 507 F.2d 1167 (D.C.Cir. 1974), discussed *infra,* in no way affects the agency's obligations under this section.

7. "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1).

quire the discipline which a published set of rules drawn up in advance can provide. The ,Department's desire to avoid red tape cannot override the statute.

## Wunderlich Act

■ Following the Supreme Court's decision in *United States* v. *Wunderlich*, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951), the Congress passed the so-called "Wunderlich Act," 41 U.S.C. §§ 321 *et seq.*, 68 Stat. 81, for the avowed purpose of reversing the outcome of that decision. In essence, the statute provides, among other things, that "in a dispute involving a question arising under" a contract with a Government agency, a decision by the agency shall not be final unless "supported by substantial evidence." Plaintiffs point out that the relationship between the CVP and its customers is a matter of contract and that the congressional policy embodied in the Act that Government officials not capriciously exercise contractual powers of decision surely makes it applicable. *See United States* v. *Lennox Metal Manufacturing Co.*, 225 F.2d 302, 318–19 (2d Cir. 1955). If the Wunderlich Act does indeed mandate the substantial evidence test in this situation, then notice and comment rate-making hearings such as those held by the Department would appear to be *per.se* inadequate. *Mobil Oil Corp.* v. *FPC*, 157 U.S.App.D.C. 235, 483 F.2d 1238, 1257–60 (1973).

There is a good deal of policy appeal to plaintiffs' argument which would in essence construe the Wunderlich Act as filling the interstices created by the public contracts and property exception to the rule-making procedures of the Administrative Procedure Act, 5 U.S.C. § 553(a)(2), discussed *infra*. However, a number of cases which this Court considers binding on it have construed the Act narrowly as applicable only to the "standard disputes clause in Government con-

tracts," and given these holdings the Act is not here applicable. *Peerless Casualty Co.* v. *United States*, 241 F.2d 811, 816 (1st Cir. 1957); *United States Fidelity & Guaranty Co.* v. *Hendry Corp.*, 391 F. 2d 13 (5th Cir. 1968).

## Due Process

Accordingly, the due process issue must be confronted. Defendants concede that plaintiffs, as preference customers, have a statutory interest entitled to some degree of due process protection. (Defendants' Memorandum of Law at 44). *Goldberg* v. *Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Thompson* v. *Washington*, 162 U.S.App.D.C. 39, 497 F.2d 626 (1973).

■ ■ Due process is inherently a flexible concept; the procedures required must be tailored to meet the needs of particular proceedings and interests. *See Cafeteria Workers Union* v. *McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed. 2d 1230 (1961); *Morrissey* v. *Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In the field of administrative law, the United States Court of Appeals for the District of Columbia Circuit has long adhered to the principle that rigid, artificial distinctions between rule-making and adjudication must be rejected in favor of a flexible approach designed to "realistically tailor the proceedings to fit the issues." *City of Chicago* v. *FPC*, 147 U.S.App.D.C. 312, 458 F.2d 731, 739–44 (1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). Thus, the Court has indicated that "procedural requirements deemed inherent in the very concept of fair hearing for certain classes of cases" may be required "even though no such requirements had been specified by Congress." *American Airlines* v. *CAB*, 123 U.S.App.D.C. 310, 359 F.2d 624, 632 (1966) (*en banc*).[8] The object is to ensure the agency will acquire the information it should have in a manner

---

**8.** *See also* Mobil Oil Corp. v. FPC, 157 U.S. App.D.C. 235, 248–51, 483 F.2d 1238 (1973); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 630 (1973); Gonzalez v. Freeman, 118 U.S.App. D.C. 180, 334 F.2d 570 (1964).

fairly calculated to illuminate the issues for reasoned decision-making. *City of Chicago* v. *FPC, supra,* 458 F.2d at 744; *see also Goss* v. *Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

Here substantial increases in the electrical rates affecting hundreds of thousands of consumers were proposed. Before appropriate rates could be set, complex determinations of "adjudicative facts" involving masses of technical data had to be made after their full significance was weighed.[9] No regulatory body with an independent staff to represent the consumer interest evaluated the assumptions, data or conclusions advanced by the proponents of the rate increase. While informal "discovery" between experts was permitted, no meaningful record was compiled which would permit reasoned analysis of their disagreements by either the initial decision-maker or the courts. The Department's experts communicated their evaluations to the decision-maker orally, and he set forth no reasons supporting his final decision. This was not a case where the decision was unambiguous and the considerations relied on were self-evident. *Compare Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402, 417, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *with Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

■ In the context of rate-making of this kind, due process requires that the basis advanced for the change be set out in suffcient detail to permit those affected to make a meaningful response. As a practical matter, this may require on-the-record questioning of experts to lay bare their assumptions and reasoning.[10] Thereafter the decision-maker must set forth the underlying findings and reasoning which led him to his conclusion. An identifiable record must be created for purposes of review. The extent to which detail is required is a practical question which depends on the nature of the subject matter and cannot be resolved in the abstract. However, it is clear that in this case a meaningful hearing was denied.

Electrical rates to the consumer may not be fixed by fiat just because tax money was the source of the initial investment. A meaningful rate-making procedure, which draws on experience in other areas of rate regulation, must be evolved. .

The Court's conclusion that due process here required limited on-the-record questioning of proponents of the rate increase and an adequate statement of reasons accompanying the final decision is not in conflict with the decision of the Court of Appeals in *Associated Elect. Coop.* v. *Morton,* 507 F.2d 1167 (D.C.Cir. 1974), in which the Court wrote:

> . . . we conclude that the action of the FPC in approving the proposed charge constituted rule-making. A formal evidentiary hearing is not required in rule-making proceedings. *United States* v. *Florida East Coast Railway,* 410 U.S. 224, 93 S.Ct. 810, 818 [35 L.Ed.2d 223] (1973).
>
> In addition, the Administrative Procedure Act provides that a hearing is not required where there is involved "a matter relating to . . public property." 5 U.S.C. § 553(a)(2). Here the FPC was concerned with a rate revision on the sale of public power, and its action was exempt from the notice and hearing requirements of § 553. (507 at 1177).

It is no trivial distinction that the statutory scheme in *Associated* involved independent agency review and determination by the FPC on a record which, by

---

9. For example, plaintiffs claim the increase is methodologically and technically dubious and that the failure to attribute incremental costs to Pacific Gas & Electric Co., a large commercial utility not given statutory "preference" but not made subject to the rate increases, in essence divests them of their statutory entitlement to preference.

10. Subject, of course, to reasonable time limitations. *Cf.* International Harvester Co. v. Ruckelshaus, *supra,* 478 F.2d at 652 (Bazelon, C. J., concurring).

statute, could only then be presented for judicial review.

More important, the legislative history of the public property exception to Section 4 of the Administrative Procedure Act clearly shows Congress did not intend to abolish procedural due process, but rather to enhance it by freeing variegated proceedings from the shackles of a single, mandatory format:

> The introductory exceptions to the section do not relieve an agency from any requirements imposed by law apart from this bill. . . . The exception of proprietary matters is included because a main consideration in such cases relates to mechanics, interpretations, or policy and it is wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural requirements. . . . But these exceptions are not to be taken as encouraging agencies not to adopt voluntary public rule-making procedures where useful to the agency or beneficial to the public. H.R.Rep. No. 1980, 79th Cong., 2d Sess. (1946), *reprinted in Legislative History of the Administrative Procedure Act ("History"),* S.Doc. No. 248, 79th Cong., 2d Sess. 257 (1946). *Accord:* S. Rep. No. 752, 79th Cong. 1st Sess. (1945), *reprinted in "History"* at 199.[11]

Procedures must be evaluated against due process standards in the aggregate. Where procedures were not fixed in advance but were vague and shifting; where not all the important technical data ultimately relied on were made available for full public comment; where the Bureau's experts made off-the-record presentations to the decision-maker but were unavailable for on-the-record questioning; and where the decision-maker never spelled out a detailed rationale for his decision, the meaningful opportunity to be heard required by due process was denied. While formal evidentiary hearings are not the only way to satisfy due process in this situation, the procedures here followed failed to do so by meeting these minimum essential criteria.

### Relief

Plaintiffs seek an order from the Court setting aside the rate increase because of the inadequacy of the procedures employed by the Department in fixing it. The Court is well aware of the fact that in many analogous situations the appropriate remedy for inadequate administrative procedures would be a remand rather than a declaration that the order as issued was invalid, *see* Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U. Pa.L.Rev. 509, 539 (1974).

Fashioning appropriate relief is essentially an equitable matter in which the Court must pay due regard to the regulatory context and the public interest. Here the entire procedure followed was grossly defective and it would be impractical to attempt to patch things up now. New proceedings are already in progress looking toward the 1977 second-step increase. Because of the nature of the standards to be employed and the necessity for the Government to recoup its investment over a fixed period of decades, these on-going proceedings will necessarily reconsider many of the same issues involved in the 1974 increases. Moreover, any interim rate increase set aside would eventually be recouped through future rates which would gradually pick up the slack. Finally, our jurisprudence has traditionally valued an opportunity for a hearing comporting

---

11. *See also* the section-by-section analysis of the bill by House Subcommittee Chairman Francis E. Walter on the floor in which he stated:

> The exemption of proprietary matters is included because in those cases the Government is in the position of an individual citizen and is concerned with its own property, funds, or contracts.

92 Cong.Rec. 5650 (May 24, 1946), *reprinted in "History"* at 358.

> Of course, when the Government sells electrical power, it is unlike a private citizen in that its rates are not subject to scrutiny by state public utility regulatory bodies.

with due process *prior* to the time a person may be deprived of a statutory entitlement. *Cf. Goldberg* v. *Kelly, supra.*

Having considered these matters and balanced the various equities, the Court in its discretion has determined that the rate increase must be set aside until hearings which comport with due process are held. Therefore, the rate increase promulgated November 1, 1973, by the Department, and which went into effect for customers of the CVP on April 1, 1974, is hereby set aside on the grounds that the procedures followed by the Department were not in accord with the requirements of § 3(a) of the Administrative Procedure Act, 5 U.S.C. § 552(a), and due process of law, as guaranteed by the Fifth Amendment to the Constitution. Defendants will be enjoined from continuing said increase in effect. Summary judgment for the plaintiffs is granted on the procedural issues; the other issues raised in the complaint are accordingly moot. Counsel for the parties shall consult and present an appropriate form of order within one week.