### CONSOLIDATED ALUMINUM CORPORATION

v.

### TENNESSEE VALLEY AUTHORITY.

Civ. A. No. 78–3210–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

June 30, 1978.

William J. Peeler, Porch, Peeler, Williams, Thompson & Bradley, Waverly, Tenn., Donald C. Winson, G. Robert Moore, Michael R. Borasky, John P. Lewis, Eckert, Seamans, Cherin & Mellott, Pittsburg, Pa., for plaintiff.

Herbert S. Sanger, Jr., Charles A. Wagner, III, James E. Fox, Tennessee Valley Authority, Knoxville, Tenn., for defendant.

## MEMORANDUM

MORTON, Chief Judge.

In this action plaintiff Consolidated Aluminum Corporation, a directly served consumer of power of the Tennessee Valley Authority (TVA), seeks to enjoin a rate adjustment approved by the TVA Board of Directors (Board) on May 17, 1978, to become effective July 2, 1978. The adjustment was approved when the TVA Board determined that it was necessary to enable TVA to continue its power program on a financially sound basis. Plaintiff argues that the TVA Board acted arbitrarily, capriciously, and abused its discretion in approving the adjustment; and that the adjustment was otherwise adopted in a procedurally defective manner.

On May 25, 1978, the date the action was filed, plaintiff moved for a preliminary injunction. Plaintiff was authorized to take the deposition of Albert O. Daniels, TVA's Director of the Division of Power Utilization; and that deposition has been filed with the Court. On June 19, 1978, TVA moved to dismiss the action or in the alternative for summary judgment. The motion was supported by the affidavits of Mr. Daniels and William E. Mason, an Assistant Secretary of TVA. A supplemental affidavit of Mr. Daniels was later filed in support of TVA's motion and in opposition to plaintiff's. Plaintiff filed the affidavit of William T. Bosworth in support of its motion. On June 20, 1978, the parties waived oral testimony, and the Court heard arguments of counsel. After considering the entire record in this case, the briefs of the parties, and the arguments of counsel, and based on these findings of fact and conclusions of law, the Court is of the opinion that plaintiff's motion for a preliminary injunction should be denied and TVA's motion to dismiss or in the alternative for summary judgment, which the Court treats as a motion for summary judgment, should be granted.

## FINDINGS OF FACT

1. On May 17, 1978, the TVA Board approved a rate adjustment applicable

across-the-board to all consumers of TVA power to become effective July 2, 1978.[1] This adjustment was approved after the Board's review and consideration of information concerning current and anticipated conditions and costs affecting TVA's operations; TVA's revenue needs during fiscal year 1978 to meet statutory and bond resolution requirements; projections for fiscal year 1979; the need to allow for contingencies; and views and comments received from distributors, industrial customers, and the general public. Following such review and consideration, the Board concluded that it was necessary to increase TVA's power revenues by about $60 million during fiscal year 1978 to enable the Board to conduct TVA's power program on a financially sound basis and in accordance with the TVA Act and the provisions of TVA's bond resolutions. The rate adjustment as approved was designed to produce additional revenues in this amount (exhs. I, K, and G to Daniels' affidavit; Mason's affidavit at 4–5).

2. The TVA Board has the responsibility under the TVA Act for establishing the rates which TVA charges for power. The basic policies governing the sale of TVA power and the fixing of rates therefor are set out in sections numbered 10, 11, 12, 14, and 15d of the TVA Act (16 U.S.C. §§ 831i, 831j, 831k, 831m, and 831n–4 (1976)). Since enactment of section 15d in 1959, TVA's power system has been financed from power revenues and from revenue bonds issued pursuant to section 15d (Daniels' affidavit at 3).

3. Subsection (f) of section 15d provides that TVA

. . . *shall* charge rates for power which will produce gross revenues sufficient to provide funds for operation, maintenance, and administration of its power system; payments to States and counties in lieu of taxes; debt service on outstanding bonds, including provision and maintenance of reserve funds and other funds established in connection therewith; payments to the Treasury as a return on the appropriation investment pursuant to subsection (e) of this section; payment to the Treasury of the repayment sums specified in subsection (e) of this section; and such additional margin as the Board may consider desirable for investment in power system assets, retirement of outstanding bonds in advance of maturity, additional reduction of appropriation investment, and other purposes connected with the Corporation's power business, having due regard for the primary objectives of the [Act], including the objective that power shall be sold at rates as low as are feasible [emphasis added].

In 1960, pursuant to authority contained in subsection (a) of section 15d, TVA adopted a Basic Bond Resolution which by its own terms constitutes a contract between TVA and the holders of its bonds. The Resolution includes provisions as to rates and revenues which repeat the above quoted requirement of section 15d(f), as well as ex-

---

[1] Historically TVA has attempted to maintain a debt coverage ratio of 1.5%, i. e., earnings of 1½ times the amount necessary to pay annual interest and annual principal due on outstanding bonds to facilitate the marketing of their bonds. This debt coverage ratio has not always been met. On one occasion TVA failed to meet the test set out in its Basic Bond Resolution, and thus was forced to utilize short-term borrowings rather than issue long-term bonds during a one-year period.

Prior to the 1978 fiscal year (October 1, 1977, and September 30, 1978), TVA had projected a margin of income of $113,000,000, after payment of operating expenses, to be available for rate tests, debt coverage ratio and fixed charge coverage. However, due to the coal strike, energy shortage (decreased income) and increased costs, an analysis in April, 1978, of the financial condition of TVA revealed that this $113,000,000 margin had disappeared, and in fact, there was an $8,000,000 expected deficit to meet the payments required by the Act. However, this condition, except possibly the extent thereof, was not unexpected. TVA and Tennessee Valley Industrial Committee (TVIC), of which plaintiff is a member had agreed to wait until the coal strike was over to measure "the effects of additional cost during the coal strike, as well as the effect the new coal contract will have on costs." (Letter dated 4/20/78 of R. L. Fozel, Vice Chairman, Rate Committee, TVIC). TVIC stated through its Vice Chairman, *supra*, that the rate review was overdue.

panding on the statutory requirements in various ways.

4. Section 10 of the TVA Act authorizes TVA to "include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes" of the Act. Section 11 states that TVA's power projects "shall be considered primarily as for the benefit of the people of the section as a whole and particularly the domestic and rural consumers to whom the power can economically be made available, and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to . . . permit domestic and rural use at the lowest possible rates." Section 15d(h) states a congressional intent that TVA have "adequate authority and administrative flexibility to obtain the necessary funds with which to assure an ample supply of electric power" in its area.

5. Under the express terms of subsections (a) and (b) of section 15d, TVA's bonds are secured solely by TVA's power revenues and are not obligations of, nor guaranteed either as to principal or interest by, the United States. Issuance of up to $15 billion of such bonds outstanding is presently authorized by section 15d, and as of September 30, 1977, the end of TVA's last fiscal year, $4,725,000,000 of such bonds was issued and outstanding. From 1960 through a part of 1974, TVA sold its revenue bonds to private underwriters, who in turn sold them to financial institutions, organizations, and members of the public. Since 1974, TVA has sold its bonds to the Federal Financing Bank. Of the $4,725,000,000 of such bonds outstanding as of September 30, 1977, $2,900,000,000 was held by the Federal Financing Bank and $1,825,000,000 by financial institutions, organizations, and members of the public. Bonds in the latter category were of varying maturities, some as late as January 1, 1999 (1977 TVA Ann. Rep., vol. II, at 5, 12).

6. The statute establishing the Federal Financing Bank authorizes it to purchase up to a specified amount of bonds issued by Federal agencies, and also to resell such bonds in the public markets. The statute requires that federal agencies generally sell their bonds only to the Bank, but contains an exception applicable to any agency whose bonds cannot by law be obligations of or guaranteed by the United States (12 U.S.C. § 2286(a) (1976)). The legislative history shows that this exception was included for the express benefit of TVA, which by reason of the exception may sell its bonds either to the Bank or in the public markets as it may determine to be most desirable from its standpoint in the case of any particular issue (H.R. Rep.No. 93–299, 93d Cong., 1st Sess. *reprinted in* [1973] U.S. Code Cong. & Admin. News, pp. 3153, 3157; *Federal Financing Bank Act Hearings Before the House Comm. on Ways and Means*, 93d Cong., 1st Sess. 19, 21, 33 (1973); S.Rep.No. 93–166, 93d Cong., 1st Sess. (1973)). The Federal Financing Bank may resell in the public markets any bonds of federal agencies which it holds (12 U.S.C. § 2285(a) (1976).

7. TVA power is sold to three types of customers: (a) some 160 municipalities and cooperatives (together with one small private utility) which in turn resell to about 2,500,000 residential, commercial, industrial, and federal agency consumers in an area comprising 80,000 square miles within seven different states; (b) a small number of industrial customers, including plaintiff, which have very large or unusual power demands; and (c) a small number of federal agencies which, as in the case of directly served industrial customers, have power demands that are very large or involve unusual characteristics (Daniels' affidavit at 2).

8. In 1970, TVA and its municipal and cooperative distributors agreed to amend their power contracts by incorporating in them a procedure for adjustments and changes in rates. Changes relate to general or major modifications in the Schedule of Rates and Charges attached to and made a part of each of these contracts. Adjustments relate to: (a) modifications of the

demand and energy charges in the wholesale rate portion of the Schedule of Rates and Charges to provide TVA with revenues which will enable it to meet statutory and bond resolution requirements; and (b) modifications in the resale rate portion of the Schedule of Rates and Charges to compensate for increases or decreases in payments by distributors as a result of the modifications in the wholesale rates (Daniels' affidavit at 4–5, and exh. B thereto).

9. As a result of the 1970 contract amendments, TVA's contracts with its distributors provide that:

TVA will review with [Municipality or Cooperative, as the case may be] or its representative, at least 30 days prior to the first day of each of the months of October, January, April, and July, pertinent data concerning the current and anticipated conditions and costs affecting TVA's operations and the adequacy of its revenues from both wholesale and other power customers to meet the requirements of the TVA Act and the tests and provisions of its bond resolutions . . . .

The contracts further provide that at least 15 days prior to the first day of each of the designated months, TVA will determine what adjustments, if any, are required in the demand and energy charges in the Schedule of Rates and Charges to assure (a) revenues to TVA adequate to meet statutory and bond resolution requirements, and (b) revenues to distributors which will compensate for modifications in their costs of power from TVA. Any such adjustments are incorporated by TVA in adjustment addendums which it publishes by mailing copies to distributors. The rate adjustment approved by the TVA Board on May 17, 1978, was so incorporated and published (Daniels' affidavit at 4, 10, and exh. B thereto).

10. The purpose of rate reviews on a quarterly basis, followed by adjustments if determined to be necessary, is to assist TVA in keeping rates as low as feasible. TVA explained this purpose to the Senate Public Works Committee in 1975 as follows:

The TVA Board strives to impose the lowest feasible charges on its customers consistent with financial soundness. The process of frequent review and adjustments make this possible. . . . If rates were to be fixed for extended time intervals, this would force cost increase assumptions for the future that would require a substantial increase in the present level of charges to provide a contingency allowance. . . .

A second consideration when rates are being minimized is the effect of unforeseen events such as tornados, equipment failure, etc. If TVA were limited to adjustment of its rates at specified times [involving longer intervals], the rates would necessarily have to include a large contingency for such events [*Tennessee Valley Authority Oversight Hearings Before the Senate Comm. on Pub. Works*, 94th Cong., 1st Sess., pt. 1, at 709–710 (1975)].

Automatic reviews on a quarterly basis also make possible speedy correction of any prior adjustment made on the basis of estimates which may later prove erroneous.

11. TVA's contracts with directly served industries such as plaintiff provide for the same basic rates as those applicable, under the resale rate portion of the Schedule of Rates and Charges in distributor contracts, to all distributor-served industrial and other consumers having loads in excess of 5,000 kilowatts. When rates applicable to distributor customers in this category are adjusted following a quarterly review, rates to industries supplied by TVA directly are thus automatically adjusted in the same way (Daniels' affidavit at 5).

12. The quarterly rate reviews between TVA and its distributors provided for in their contracts are conducted on the basis of conferences and discussions between distributors and TVA representatives, not hearings. The review process was developed to permit great flexibility in scheduling such discussions as a particular situation may call for, without any prescribed timetable other than that set out in the contract, and also without any procedural require-

ments or limitations that would inhibit either free give-and-take discussion or the ability of the TVA Board to act quickly as the whole concept requires. Most of the distributors are members of the Tennessee Valley Public Power Association (TVPPA) which has a rates and contracts committee that conducts quarterly rate reviews with TVA (Daniels' affidavit at 5–6).

13. Most of TVA's directly served industrial customers, including plaintiff, are members of the Tennessee Valley Industrial Committee (TVIC). On January 7, 1971, the chairman of TVIC addressed a letter to the chairman of the TVA Board stating that TVIC had recently established a rate committee; listing the members of such committee, one of whom was a representative of plaintiff; and asking that TVA recognize and discuss TVA affairs with the committee, and "particularly . . . that our group have the benefit of advance discussion of action on TVA's quarterly rate reviews or other matters concerning TVA's rates, as in the case of the TVPPA group." TVA stated in reply that it would be "glad to meet with the rate committee during the review period to exchange data and discuss matters of mutual interest and · concern." Since this exchange of letters, the TVIC rate committee has participated regularly in conferences and discussions with TVA during review periods preceding determination as to rate adjustments, including the one involved in this case (Daniels' affidavit at 6).

14. No generally applicable timetable or pattern has been fixed for TVA Board meetings during quarterly review periods, whether or not the reviews were followed by any rate adjustments. Since quarterly rate reviews were begun in 1970, five adjustments, excluding the adjustment at issue here, have been approved by the TVA Board. Only two of these involved a 2-week interval between two Board meetings. As to the remaining three adjustments, the interval between the two Board meetings varied from one to eight days. As to those reviews which were not followed by any rate adjustments, there is no record of more than one TVA Board meeting for a number

of reviews. Where two meetings were held, the intervals between them varied and in the majority of instances was less than two weeks (supplemental affidavit of Albert O. Daniels and Exhibits A and B thereto).

15. In 1975, the chairman of the TVIC rate committee testified before the Senate Public Works Committee that TVIC had found TVA cooperative in reviewing rate matters with TVIC, and that TVIC did not favor an institutional arrangement providing for review or supervision of TVA rates (*Tennessee Valley Authority Oversight Hearings Before the Senate Comm. on Pub. Works, supra* finding No. 10, at 801–02).

16. In 1976, TVA published a Final Environmental Statement on its policies relating to electric power rates, after previously publishing a Draft Environmental Statement and holding three public hearings on the subject. The draft statement, as well as the final statement, referred specifically to TVA's quarterly rate review arrangements, including those with TVIC. TVIC wrote a letter to TVA commenting on the draft statement in which it indicated no dissatisfaction with these arrangements. Officials of TVIC and a representative of plaintiff presented statements during the public hearings. None of them expressed dissatisfaction with the quarterly rate reviews. One of the TVIC officials and plaintiff's own representative specifically recognized the desirability of TVA rates which would produce a margin above actual costs. The TVIC official noted, among other points bearing on this matter, that "it is less expensive to TVA's rate payers to pay a reasonable margin to cover a reasonable portion of the costs of new plants than to pay the excessive interest costs that would result from over-borrowing" (exh. E to Daniels' affidavit at 1.08 to 1.09, 2.0–3 to 2.0–22; exh. F to Daniels' affidavit at ṇ0, 231–32).

17. The information before the TVA Board at the time it approved the rate adjustment challenged in this case included projections by the TVA power staff show-

ing that without an adjustment TVA's power revenues for fiscal year 1978 would be insufficient by $8 million to provide funds for the payments specifically required by section 15d(f) and the corresponding provision in section 3.2 of TVA's Basic Bond Resolution, and would of course provide nothing for additional margin. Further, the $8 million deficit as to required payments was based on raw estimates containing no allowance for contingencies which might render the projection inaccurate and the actual deficit substantially greater (Daniels' affidavit at 7).

18. The TVA Board was briefed by its power staff on May 2, 1978, concerning TVA's financial condition and forecasts and the staff's view that an upward rate adjustment would be necessary to meet TVA's statutory rate tests and bond covenants. A tentative schedule was arranged for the Board to consider the need for a rate adjustment on a preliminary basis on May 11 and to take final action approving any rate adjustment determined to be necessary on May 25. On May 5, William L. Jenkins, one of the three Board members, resigned effective immediately. The term of Aubrey J. Wagner, one of the two remaining Board members, was due to expire on May 18 (Daniels' affidavit at 8).

19. The TVA staff reviewed pertinent data concerning conditions and costs affecting TVA's operations and the adequacy of its revenues to meet statutory and bond requirements with the TVPPA rates and contracts committee on May 3 and with the TVIC rate committee on May 9. The May 9 date was agreed upon in early April by TVA staff and the Chairman of the TVIC rate committee and was scheduled for that date so that TVA "could measure the effects of the additional costs during the coal strike, as well as the effect the new coal contract will have on costs" (April 28 letter from Vice Chairman of the TVIC rate committee to committee members, including plaintiff, attached as an appendix to TVA's reply brief). During the meetings, both groups were informed of the staff's projection of TVA's need for additional revenues for fiscal year 1978 in the order of

$75 to $96 million. During the May 9 meeting, representatives of the TVIC, including Consolidated, were informed that open TVA Board meetings would be held on May 11 and May 17 to consider and approve any rate adjustment. The change from May 25 to May 17 resulted from the resignation of Director Jenkins and the need to take action prior to the expiration of Chairman Wagner's term on May 18, while there was still a quorum. Consolidated and the other TVIC representatives were all invited to attend and present their views at both meetings (Daniels' affidavit at 8).

20. The staff transmitted various pertinent data to the TVA Board prior to the May 11 meeting, and at that meeting made an oral presentation explaining the data and recommending a rate adjustment which would provide an additional $85 million during fiscal year 1978. Among others, a representative of plaintiff was present at the meeting and made an oral statement expressing plaintiff's opposition to the proposed increase. The Board expressed extreme concern over the effects of an upward rate adjustment of the magnitude proposed by its staff and directed the staff to prepare a list of possible budget reductions that would reduce TVA's revenue needs by $50 million during the remainder of fiscal year 1978. The Board stated during the May 11 meeting that the next meeting would be held on May 17, before the expiration of Mr. Wagner's term in order that there would be a quorum enabling the Board to take action in the matter (Daniels' affidavit at 8-9).

21. Following the May 11 meeting, the staff asked the TVPPA and TVIC rate committees whether they would like to meet further before May 17. The TVPPA committee indicated that it saw no need for such a meeting, while the TVIC committee believed another meeting would be desirable. The staff accordingly met with and discussed the matter further with the TVIC rate committee on May 15. At that meeting, a representative of plaintiff handed to TVA staff copies of a written presentation opposing an upward rate adjustment and

requested that copies be forwarded to the two Board members. This was done, and such presentation was before the Board when it took final action approving a rate increase on May 17. Neither in such written presentation nor in its earlier oral presentation on May 11 did plaintiff challenge the correctness of TVA staff's statistical estimates or projections. Instead, plaintiff's objections stressed the effect the adjustment would have on Consolidated; that TVA should not consider the 1.5 interest coverage ratio in arriving at a desirable margin; and that the adjustment would be inflationary (Daniels' affidavit at 9–10 and exh. I thereto; exh. G to Mason's affidavit).

22. At the May 17 meeting, TVA staff reported that it had been able to find only $5 million in budget reductions which appeared practicable, and that it still recommended an upward rate adjustment to produce $85 million of additional revenues in 1978. The Board, after stating that it was "reluctant to go any higher than we absolutely have to" (exh. K to Daniels' affidavit at 19) and "I think we need to really put ourselves in a bind. . . . For this fiscal year I kind of feel we have got to hurt a little bit these last three or four months" (exh. K to Daniels' affidavit at 11), approved an adjustment to produce an estimated $60 million of such additional revenues. The basis for the Board's decision is explicated in the Board resolution approving the increase:

The Board, after completing its rate review, which included among other things the review and consideration of information concerning the current and anticipated conditions and costs affecting TVA's operations, the projected differences in revenues for this fiscal year required to meet statutory and bond resolution requirements as well as projections for fiscal year 1979, the need to allow for contingencies, and the views and comments from distributors, industrial customers, and the general public, determined that it was necessary to increase TVA's revenues from the sale of power by about $60 million in the current fiscal year by making adjustments to the energy and demand charges of the wholesale and resale rate schedules in order to enable the Board to continue to conduct TVA's power program on a financially sound basis in accordance with the financial and other requirements and provisions of the Tennessee Valley Authority Act of 1933, as amended, and to meet the requirements and tests and comply with the provisions of its bond resolutions. The Board concluded that the rate adjustment should provide for a uniform increase to all classes of service [exh. G to Mason's affidavit].

23. The transcripts of the Board meetings show that one factor considered by the Board in determining the amount of the adjustment was the desirability of providing a sufficient margin to produce an interest coverage ratio of 1.5. The transcripts further show that the staff explained to the Board—and one Board member indicated he already knew—that at least 13 states require that an issue of bonds have an interest coverage ratio of at least 1.5 if the bonds are to be legal investments for financial institutions in those states (exh. I to Daniels' affidavit at 23–25).

24. The transcripts show that the Board also gave consideration to the preservation of TVA's AAA bond rating in order that future sales of bonds in the public markets would be made at the lowest possible interest rates (exh. I to Daniels' affidavit at 24–25).

25. TVA publicly announced the May 11 Board meeting on May 4. On the same date it mailed a copy of the announcement to over 1,000 institutions, including newspapers, television and radio stations in the TVA area and nationwide; hand-delivered copies to the wire services and local newspapers in Knoxville; posted a copy at TVA's administrative headquarters where all Government in the Sunshine Act notices are posted; and telecopied the announcement to the *Federal Register*, which published it in its issue of May 8. TVA publicly announced the May 17 Board meeting on May 12; distributed it in the same manner

as the public announcement for the May 11 Board meeting; and telecopied it to the *Federal Register,* which, because it was not actually received until after 4 p. m., did not file it until the following business day, May 15, nor publish it until May 17. On May 16, TVA publicly announced a change in location—to a different room in the same building—of the May 17 meeting, and telecopied it to the *Federal Register* which published it on May 19 (Mason's affidavit at 1–4).

26. As stated in the certificate of John L. Dugger, an Assistant Secretary of TVA, included in the record as plaintiff's Appendix 22,

> . . . there exists no law, resolution, or other requirement governing the procedures of the Tennessee Valley Authority Board of Directors in connection with its meetings other than the Tennessee Valley Authority Act of 1933, as amended, the Government in the Sunshine Act and related implementing regulations, and a resolution of the Board adopted November 30, 1961 (Minute Entry 860–22), which has been since its adoption and is now in full force and effect.

That resolution, included as a part of plaintiff's Appendix 22, applies only to the internal procedure for calling and giving notice of Board meetings and specifically provides that a Director shall automatically waive notice by attending any meeting.

## CONCLUSIONS OF LAW

■ 1. The TVA Act commits the fixing of TVA's rates to the discretion of the TVA Board and precludes judicial review thereof. *Allen v. Electric Power Bd. of Met. Gov't., Etc.,* 422 F.Supp. 4 (M.D.Tenn. 1976), *appeal pending,* No. 76–2678 (6th Cir.); *Ferguson v. Electric Power Bd. of Chattanooga & TVA,* 511 F.2d 1403 (6th Cir. 1975), *adopting and aff'g* 378 F.Supp. 787 (E.D.Tenn.1974); *Mobil Oil Corp. v. Tennessee Valley Authority,* 387 F.Supp. 498 (N.D.Ala.1974); *Tennessee Elec. Power Co. v. Tennessee Valley Authority,* 21 F.Supp. 947 (E.D.Tenn.1938) (conclusion of law No. 33), *aff'd,* 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939) (quoted at 387 F.Supp. 508).

■ 2. By express statute and the terms of TVA's Basic Bond Resolution entered into pursuant to statute, the rates charged by TVA must produce gross revenues sufficient to provide funds not only for specifically designated purposes but also "such additional margin as the [TVA] Board may consider desirable for investment in power system assets . . . and other purposes connected with the Corporation's power business." TVA Act, § 15d(f), 16 U.S.C. § 831n–4(f) (1976). The amount of margin which the TVA Board may consider desirable to assure the financial soundness of the TVA power system is a component of the rates and no more subject to judicial review than the rates themselves. *Mobil Oil Corp. v. Tennessee Valley Authority,* 387 F.Supp. 498, 506 (N.D.Ala.1974).

■ 3. Even if the Court could judicially review TVA's rates or the margin component included in such rates, the Court could not conclude that there was any impropriety in the TVA Board's consideration of a 1.5 interest coverage ratio in determining a desirable margin, since such a ratio is widely recognized as a minimum test of financial soundness which must be met if bonds of a particular issuer are to be legal investments. The same is true with respect to the Board's consideration of TVA's bond ratings since TVA is entitled by law to sell its bonds in the public markets and since the Federal Financing Bank, to which TVA may also sell its bonds, is authorized to resell such bonds in the public markets. Both of such considerations are "purposes connected with the Corporation's power business," and in addition any margin realized on account of such considerations will be in the form of gross revenues which will be available "for investment in power system assets" in lieu of borrowings otherwise necessary for that purpose.

■ 4. The transcripts of the TVA Board meetings of May 11 and May 17, 1978, show that the TVA Board gave detailed and earnest consideration to the rate adjustment and the oral and written infor-

mation relating thereto which was presented to it by its staff and others, including plaintiff; sought to avoid an increase so far as practicable by budgetary reductions, and approved an increase substantially less than that recommended by its staff and one designed to set rates as low as feasible while at the same time meeting the financial requirements of the TVA Act and TVA's Basic Bond Resolution; and therefore did not abuse its discretion or act arbitrarily or capriciously in considering and approving the adjustment.

█ 5. TVA's fixing of power rates is quasi-legislative in nature. *Keller v. Potomac Elec. Power Co.,* 261 U.S. 428, 440–41, 43 S.Ct. 445, 67 L.Ed. 731 (1923); *Long Island R. R. v. United States,* 318 F.Supp. 490, 495 (E.D.N.Y.1970) (3-judge court); 1 K. Davis, *Administrative Law Treatise* 297 (1958).

6. Such action constitutes informal rulemaking. 5 U.S.C. § 553(c) (1976). *American Trucking Ass'ns v. United States,* 344 U.S. 298, 319–20, 73 S.Ct. 307, 97 L.Ed. 337 (1953); *United States v. Florida East Coast Ry.,* 410 U.S. 224, 234–38, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). However, such action, including specifically the making of quarterly rate adjustments, is taken in accordance with contracts between TVA and its customers (*see* TVA Act, § 10, 16 U.S.C. § 831i (1976); *Mobil Oil Corp. v. Tennessee Valley Authority,* 387 F.Supp. 498, 508–09 (N.D.Ala.1974); *Ferguson v. Electric Power Bd. of Chattanooga & TVA,* 378 F.Supp. 787 (E.D.Tenn.1974), *aff'd,* 511 F.2d 1403 (6th Cir. 1975)) and also involves the disposition of public property (TVA Act, § 4(h), 16 U.S.C. § 831c(h) (1976); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 330–40, 56 S.Ct. 466, 80 L.Ed. 688 (1936); *Tennessee Elec. Power Co. v. Tennessee Valley Authority,* 21 F.Supp. 947, 960 (E.D. Tenn.1938) (3-judge court), *aff'd,* 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Mobil Oil Corp. v. Tennessee Valley Authority, supra,* at 507 n.22; *Tennessee Valley Authority v. Lenoir City,* 72 F.Supp. 457, 460–61 (E.D.Tenn.1947)). Such action is therefore exempt from the informal rulemaking

requirements of the Administrative Procedure Act, 5 U.S.C. § 553 (1976), by reason of the express exception in subsection (a)(2) of such section with respect to "a matter relating to . . . public property . . . or contracts." The adjudication requirements of the Administrative Procedure Act, 5 U.S.C. § 554 (1976), are also not applicable since the agency determination was not required to be made on the record after opportunity for an agency hearing.

█ 7. Section 552 of Title 5, United States Code, requires publication in the *Federal Register* of procedures and rules of procedure which an agency has actually adopted concerning matters relating to public property or contracts. It does not, however, require an agency to adopt such procedures; and a court cannot create duties in this regard which are not imposed by statute, particularly since the "rule making section of the APA, § 553, manifests a clear legislative intent to permit *ad hoc* decision making in the distribution of public property." *City of Santa Clara v. Andrus,* 572 F.2d 660, 674 (9th Cir. 1978); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 521, 546, 98 S.Ct. 1197, 1201, 1213, 55 L.Ed.2d 460, 467, 481 (1978); *contra, Northern Cal. Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), *aff'd* 176 U.S. App.D.C. 241, 539 F.2d 243 (1976).

█ 8. The only practice TVA has followed with regard to quarterly rate reviews is that of holding, first with distributors pursuant to their power contracts, and by later arrangement with TVIC. However, the manner of holding them and the timetables for holding them have been left completely flexible. Thus, no procedure has been adopted and there is none to publish. *See City of Santa Clara v. Andrus,* 572 F.2d 660, 674–75 (9th Cir. 1978). Even assuming the mere fact of holding reviews as contemplated under the distributor contracts was itself a procedure, it is one of which plaintiff has had actual notice and participated in for seven years; and in view of the language in 5 U.S.C. § 552 creating an exception where one has actual and timely notice, plaintiff could have no claim based

on nonpublication in the *Federal Register.* *Whelan v. Brinegar,* 538 F.2d 924, 927 (2d Cir. 1976); *Rodriguez v. Swank,* 318 F.Supp. 289, 295 (N.D.Ill.1970) (3-judge court), *aff'd,* 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).

█ 9. Also, even if the flexible manner in which TVA conducts the quarterly reviews constituted a procedure within the meaning of section 552, plaintiff had notice of every stage in the process and availed itself of its opportunity to participate. It was present at TVIC's two meetings with the TVA Power staff, made an oral presentation at the May 11 Board meeting, and also made a written presentation which was one of the documents which was considered by the Board before it approved the adjustment. Here again, in view of the express exception language in section 552, these facts alone would defeat plaintiff's nonpublication claim. *Whelan v. Brinegar,* 538 F.2d 924, 927 (2d Cir. 1976); *Rodriguez v. Swank,* 318 F.Supp. 289, 295 (N.D.Ill.1970) (3-judge court), *aff'd,* 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).

█ 10. Not only has TVA not adopted any timetables for Board meetings in connection with quarterly rate reviews, but none has become established by practice. The fact that in two of the six instances in which the TVA Board has approved rate adjustments there were two Board meetings at two-week intervals—whereas in the other four instances there were two Board meetings at intervals of one to eight days—does not establish either a formal or informal procedure under section 552 (*see City of Santa Clara v. Andrus,* 572 F.2d 660, 673–74 (9th Cir. 1978)) or "the type of long-standing and well-established practice deviation from which might justify judicial intervention" (*Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460, 479 n.17 (1978); *see also City of Santa Clara v. Andrus, supra* ).

11. The Board's action in rescheduling to May 17 its second meeting which was originally scheduled for May 25, leaving an interval of six days instead of two weeks between the Board's two meetings considering the quarterly rate adjustment, did not constitute a departure from any established practice or procedure since none existed. Even if it did, such a departure could not be regarded as "totally unjustified" since the Board would be left without a quorum after May 18 and action on an adjustment by that date was necessary if the Board was to avoid a violation by TVA both of its statutory requirements and its covenants with the holders of its bonds. Further, even had any established practice with respect to two-week intervals existed, it could have been altered under 5 U.S.C. § 552 by publishing the new procedure or providing actual notice. Here again, it is undisputed that plaintiff had actual notice.

█ 12. TVA's Board resolution adopting a procedure for calling and giving notice of Board meetings is an internal procedure, and one which plaintiff is not "required to resort to" and by which it is not "adversely affected." It was therefore not required by 5 U.S.C. § 552 to be published in the *Federal Register,* and plaintiff has no valid ground for complaint based on its nonpublication. *T.S.C. Motor Freight Lines, Inc. v. United States,* 186 F.Supp. 777, 786 (S.D.Tex.1960), *aff'd per curiam,* 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961); *Pasco, Inc. v. Federal Energy Adm'n,* 525 F.2d 1391, 1405 (Temp.Emer.Ct. App.1975); *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971).

█ 13. Any property interest of plaintiff entitled to due process must derive either from statute or its power contracts with TVA. *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Sims v. Fox,* 505 F.2d 857, 860–61 (5th Cir. 1974) (en banc), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975).

█ 14. In view of the provisions of section 15d of the TVA Act and of plaintiff's power contracts, which entitle it "subject to the provisions" of the TVA Act simply to purchase electricity at the prevail-

ing rates applicable to purchases by distributor customers with loads in excess of 5,000 kV, plaintiff has no property right to any particular rates, including the rates as they have existed prior to the effective date of the quarterly adjustment. *Sellers v. Iowa Power & Light Co.,* 372 F.Supp. 1169, 1172 (S.D.Iowa 1974) (3-judge court); *Holt v. Yonce,* 370 F.Supp. 374, 376–77 (D.S.C. 1973), *aff'd,* 415 U.S. 969, 94 S.Ct. 1553, 39 L.Ed.2d 867 (1974); *Georgia Power Project v. Georgia Power Co.,* 409 F.Supp. 332 (N.D. Ga.1975); *State ex rel. Jackson County v. Public Serv. Comm'n,* 532 S.W.2d 20, 31–32 (Mo.1975). This conclusion is in no way affected by the fact that an increase in rates may adversely affect plaintiff's business interests. *Rivera v. Chapel,* 493 F.2d 1302, 1304 (1st Cir. 1974); *Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp.,* 506 F.2d 467 (9th Cir. 1974).

15. In addition, procedural due process requirements are not applicable to informal rulemaking, including rate-fixing, which is applicable across-the-board to two and one-half million consumers of TVA power, of whom plaintiff is one. *Public Utils. Comm'n v. United States,* 356 F.2d 236, 241 (9th Cir.), *cert. denied,* 385 U.S. 816, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966); *Bi-Metallic Inv. Co. v. Colorado,* 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *United States v. Florida E. Coast Ry.,* 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *contra, Northern Cal. Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), *aff'd,* 176 U.S.App.D.C. 241, 539 F.2d 243 (1976).

16. There is another reason why plaintiff had no due process right to a hearing. Plaintiff has not challenged the TVA Power staff's estimates and projections, but only the conclusions drawn by the TVA Board with respect to the margin which was desirable and the rates which should be charged in the light of the staff's estimates and projections. Since there are thus no disputed issues of fact, but only of policy, no due process right to a hearing would exist in any event. *Weinberger v. Hyson, Westcott & Dunning,* 412 U.S. 609, 621, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Producers Livestock Mktg. Ass'n v. United States,* 241 F.2d 192, 196 (10th Cir. 1957), *aff'd,* 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958); *Citizens for Allegan County, Inc. v. FPC,* 134 U.S.App.D.C. 229, 231, 414 F.2d 1125, 1128 (1969).

17. Even assuming procedural due process requirements were applicable, plaintiff received the process it was due. In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court pointed out that:

" '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). "[D]ue process is flexible and calls for such procedural protection as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972) [at 334, [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484]].

TVA in holding two meetings with TVIC representatives, including representatives of plaintiff, and in receiving both an oral and a written expression of plaintiff's views, accorded plaintiff an opportunity for effective input and more than the process which would be constitutionally due. This process was greater than that which would have been required under 5 U.S.C. § 553— *i.e.,* notice and an opportunity to participate through submission of written materials, had TVA been subject to rather than exempt from that section—and compliance with that section in rule-making fulfills procedural due process requirements. *California Citizens Band Ass'n v. United States,* 375 F.2d 43, 50 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967); *American Pub. Gas Ass'n v. FPC,* 186 U.S. App.D.C. 23, 74, 567 F.2d 1016, 1067 (1977).

18. The fact that the second Board meeting was rescheduled from May 25 to May 17, giving plaintiff only eight days to provide its input, does not amount to a constitutional due process deprivation. Time alone is not controlling. In *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 42

L.Ed.2d 725 (1975), involving a school suspension, the Supreme Court held that the required hearing could be held minutes after notice was given. In *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), involving termination of welfare benefits, the Supreme Court found that a seven-day notice period was constitutionally sufficient. In other circumstances more time may be required. What is important is that time limits are flexible depending on the circumstances of each particular situation. Here, the circumstances required that the TVA Board act before the expiration of Mr. Wagner's term.

19. Here, since the process accorded plaintiff by TVA conformed with that which plaintiff joined other TVIC members in requesting in 1971, and in which plaintiff subsequently acquiesced, plaintiff can have no valid complaint with respect to the process accorded in any event. *H. P. Coffee Co. v. Reconstruction Fin. Corp.,* 215 F.2d 818, 822–23 (Emer.Ct.App.1954); *United States v. Friedman,* 506 F.2d 511, 513 n.1, 515 (8th Cir. 1974), *cert. denied,* 423 U.S. 885, 96 S.Ct. 160, 46 L.Ed.2d 116 (1975).

20. The transcripts of the TVA Board meetings of May 11 and May 17, 1978, show that the TVA Board acted in good faith in approving the quarterly rate adjustment. The manner in which it did so, in view of the requirements of the TVA Act and its Basic Bond Resolution and the situation in which it found itself due to the resignation of Mr. Jenkins on May 5 and the impending expiration of Mr. Wagner's term on May 18, was in no way commercially unreasonable, particularly as the provision of plaintiff's power contract making it "subject to the provisions" of the TVA Act reads those provisions including section 15d into the contract. *Tennessee Elec. Power Co. v. Tennessee Valley Authority,* 21 F.Supp. 947, 957 (E.D.Tenn.1938) (3-judge court), *aff'd,* 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939).

21. TVA complied with the Government in the Sunshine Act (5 U.S.C. § 552b (1976)); and TVA's regulations thereunder (18 C.F.R. § 301.44 (1977)), with regard to publication of notice of the May 11 and May 17 Board meetings in light of the facts set forth in the affidavit of William E. Mason. Further, plaintiff had actual notice of both meetings, and in any event, the TVA Board's approval of the quarterly rate adjustment would not be invalidated by failure to comply with the Government in the Sunshine Act in view of the provisions thereof contained in 5 U.S.C. § 552b(h)(2).

22. Plaintiff in no event would be entitled to a preliminary injunction since it has not carried its burden of persuasion that the threatened injury to plaintiff outweighs the harm an injunction would do to defendant and to the public interest in placing TVA in default with respect to its statutory obligations and its covenants with the holders of its bonds, which defaults could adversely affect TVA's credit rating, future costs of money, and future levels of rates resulting in any increases in costs of money. *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 572–73 (5th Cir. 1974); *North Avondale Neighborhood Ass'n v. Cincinnati Metropolitan Housing Auth.,* 464 F.2d 486 (6th Cir. 1972); *Hamlin Testing Laboratories, Inc. v. United States Atomic Energy Comm'n,* 337 F.2d 221, 222 (6th Cir. 1964). This is especially the case since TVA's rates will automatically be reviewed again in three months, and if there was any error in regard to the rate adjustment under attack, it can be corrected at that time.

A judgment shall enter in accordance with these findings of fact and conclusions of law denying plaintiff's motion for a preliminary injunction and granting TVA's motion for summary judgment, dismissing this action with full prejudice, at plaintiff's costs.